**LUMBERMAN'S UNDERWRITING ALLIANCE, Acting By Its Attorney-In-Fact, U. S. Epperson Underwriting Company, Plaintiff,**

v.

**Carla A. HILLS, Secretary of Housing and Urban Development, Defendant.**

Civ. A. No. 20234-3.

United States District Court, W. D. Missouri, W. D.

May 3, 1976.

William H. Sanders, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, Mo., for plaintiff.

Irving Jaffe, Acting Asst. Atty. Gen., Washington, D. C., C. J. Poirier, Mary A. Schneider, Asst. U. S. Attys., Kansas City, Mo., for defendant.

ORDER GRANTING DEFENDANT'S MO-
TION FOR SUMMARY JUDGMENT
AND FINAL JUDGMENT DENYING
ALL RELIEF PRAYED FOR IN THE
COMPLAINT

WILLIAM H. BECKER, Chief Judge.

This is an action under the Urban Property Protection and Reinsurance Act of 1968,[1] as amended,[2] Section 1749bbb, *et seq.,* Title 12, United States Code (hereinafter "Reinsurance Act"). Plaintiff, Lumberman's Underwriting Alliance, contends that the decision of the defendant Secretary of Housing and Urban Development to reinsure plaintiff and Universal Underwriters Insurance Company (hereinafter "Universal") as a single aggregate entity under one Standard Reinsurance Contract for 1972–1973 and subsequent years violated the Reinsurance Act. Plaintiff seeks a declaratory judgment[3] that (1) defendant may only require

---

1. P.L. 90–448, 82 Stat. 555.

2. Title VI of Housing and Urban Development Act of 1970, P.L. 91–609, 84 Stat. 1770 (1970);

National Insurance Development Act of 1975, P.L. 94–13, 89 Stat. 68 (1975).

3. Sections 2201, 2202, Title 28, United States Code.

a single contract for two or more companies under common ownership; (2) plaintiff is not under common ownership with Universal; and (3) defendant is required to issue a separate reinsurance contract to plaintiff for 1972–73 and subsequent years. Defendant has moved for summary judgment. Plaintiff filed a memorandum in opposition to the motion. Defendant filed a supplemental memorandum, and both parties have filed reply memoranda.

Before reaching the merits, two preliminary issues must be considered.[4]

I. *Plaintiff's Capacity to Sue.*

█ Plaintiff is a reciprocal interinsurance exchange organized under the laws of Missouri, Section 379.650, *et seq.,* V.A.M.S. It brings this action by its attorney-in-fact, U. S. Epperson Underwriting Company. Defendant contends that plaintiff is an unincorporated association which lacks capacity to sue under Missouri law. However, it is concluded that a reciprocal interinsurance exchange acting by its attorney-in-fact has such capacity.

Rule 17(b) of the Federal Rules of Civil Procedure provides in pertinent part that with the exception of individuals and corporations, " . . . the capacity to sue or be sued shall be determined by the law of the state in which the district court is held . . . ."

Defendant has cited several cases which hold that an unincorporated association lacks capacity to sue under Missouri law.[5] However, none of these cases involved a reciprocal interinsurance exchange. No reported cases have been found in which the question of the capacity of a reciprocal to sue under Missouri law was considered. Therefore, resolution of this issue requires

analysis of the nature of a reciprocal and its attorney-in-fact.

The nature of a reciprocal and the reciprocal's relationship to its attorney-in-fact are discussed in *In re International Underwriters,* 157 F.Supp. 367 (W.D.Mo.1957); *In re Manufacturing Lumbermen's Underwriters,* 18 F.Supp. 114 (W.D.Mo.1936); and *Yeats v. Dodson,* 345 Mo. 196, 127 S.W.2d 652 (1939), *modified,* 345 Mo. 196, 138 S.W.2d 1020 (1939). A reciprocal is composed of subscribers who agree to insure each other against specified risks. The activities of a reciprocal are carried on through an attorney-in-fact whose powers are set out in a written power of attorney executed by each subscriber.

A reciprocal has no legal existence separate from its subscribers, and is therefore considered an unincorporated association. *In re International Underwriters, supra; In re Manufacturing Lumbermen's Underwriters, supra; Yeats v. Dodson, supra.* Although an unincorporated corporation lacks capacity to sue under Missouri law,[6] an action on behalf of the association may be maintained by one or more of its members. *Edgmond v. Brixey,* 450 S.W.2d 166 (Mo. 1970); *Harger v. Barrett,* 319 Mo. 633, 5 S.W.2d 1100 (1928).

Each of plaintiff's subscribers have granted to U. S. Epperson Underwriting Company, the attorney-in-fact, a power of attorney " . . . to appear in behalf of Subscriber in any suit, action or proceeding, and bring, prosecute, defend or otherwise settle any suit, action or proceeding. . . . " (P.Ex. 8). Because this action is brought by plaintiff's attorney-in-fact, and because plaintiff's attorney-in-fact has been specifically authorized by each of the subscribers to bring the action, plaintiff by its

---

4. In view of the ruling on the merits, it is unnecessary to consider whether Universal is an "indispensable party," or whether plaintiff is estopped from bringing this action because it accepted a single 1972–73 reinsurance contract under protest.

5. *United States v. Building and Construction Trades Council, AFL–CIO,* 271 F.Supp. 447 (E.D.Mo.1966); *In re Associated Cemetery Management, Inc., Employees Profit Sharing*

*Trust,* 170 F.Supp. 298 (W.D.Mo.1958), *aff'd,* 268 F.2d 97 (8th Cir. 1959); *Ruggles v. International Association of Bridge, Structural and Ornamental Iron Workers,* 331 Mo. 20, 52 S.W.2d 860 (1932); *Morris v. Willis,* 338 S.W.2d 777 (Mo.1960); *Newton County Farmers' & Fruit Growers' Exchange v. Kansas City Southern R. Co.,* 326 Mo. 617, 31 S.W.2d 803 (1930).

6. *Id.*

attorney-in-fact has capacity to sue. *Compare: In re Manufacturing Lumbermen's Underwriters, supra.*[7]

## II. *Jurisdiction.*

In the complaint, plaintiff alleged that this court has subject matter jurisdiction under the "federal question" statute, Section 1331, Title 28, United States Code. Defendant contends that the $10,000 amount in controversy requirement under Section 1331 has not been satisfied in this action. However, the facts plead in the complaint show not only that the $10,000 jurisdictional requirement of Section 1331 has been met, but also that jurisdiction exists regardless of the amount in controversy under Section 1337, Title 28, United States Code.

### A. *Section 1331, Title 28, United States Code.*

■ The longstanding general federal rule is that the amount in controversy is to be determined from the complaint, unless it appears or is in some way shown that the amount stated in the complaint is not claimed "in good faith." In deciding the question of good faith, it " . . . must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal." *Horton v. Liberty Mutual Ins. Co.,* 367 U.S. 348, 353, 81 S.Ct. 1570, 1573, 6 L.Ed.2d 890, 894 (1961); *St. Paul Mercury Indem. Co. v. Red Cab Co.,* 303 U.S. 283, 288, 58 S.Ct. 586, 82 L.Ed. 845, 848 (1938); *Buffington v. Amchem Products, Inc.,* 489 F.2d 1053 (8th Cir. 1974); *Crenshaw v. Great Central Ins. Co.,* 482 F.2d 1255 (8th Cir. 1973).

The following facts are uncontroverted. Under the Standard Reinsurance Contract, a company which is reinsured may recover for its losses in any one state an amount equal to its aggregate losses in that state in excess of the company's "net retention" or deductible for that state, Section 1906.21, *et seq.,* Title 24, Code of Federal Regulations. The net retention is the greater of $1,000.00 or 2½ percent of the premium income earned in the state for those lines reinsured. Defendant's combination of plaintiff and Universal in a single reinsurance contract means that the losses incurred by plaintiff in each state must exceed the combined net retentions of both companies, assuming that Universal has no losses, before plaintiff can recover reinsurance benefits. Thus plaintiff's exposure to liability is greatly increased. In at least four states in 1972, the combined net retention of plaintiff and Universal was more than $10,000.00 in excess of plaintiff's net retention alone. In all states in which plaintiff and Universal both do business, in 1972 plaintiff's overall exposure to liability was increased by $159,150.00 as a result of the single reinsurance contract.

Defendant's contention is that the mere exposure to liability in excess of $10,000.00 is insufficient to meet the jurisdictional requirement in the absence of a showing of probability that such liability will be incurred. If that were the proper test, plaintiff would be compelled to prove the probability of civil disorders causing great amounts of damages either in one of the four states mentioned above, or in several states combined, which would subject plaintiff to liability greater than $10,000.00 in excess of its liability under a single contract. Plaintiff has shown that such losses are not impossible by presenting evidence of a loss in California which, although disqualified for reinsurance benefits by defendant, subjected plaintiff to a possible

---

**7.** This ruling renders it unnecessary to determine whether plaintiff has capacity to sue under Rule 17(b)(1), F.R.Civ.P., *supra,* which provides in pertinent part that an

" . . . unincorporated association, which has no such capacity by the law of [the] state, may sue or be sued in its common name for the purpose of enforcing for or against it a substantive right existing under the Constitution or laws of the United States . . . ."

However, because the basis of plaintiff's asserted right to be reinsured under a separate contract is Section 602(b), Title VI of the Reinsurance Act, Section 1749bbb–2, Title 12, United States Code, it would appear that plaintiff is seeking to enforce a "substantive right existing under the . . . laws of the United States."

excess liability of $16,560.00 under the 1972–73 contract.

■ However, it is concluded that the determination of the amount in controversy does not depend on the probability of actual excess liability, but on the exposure to excess liability without regard to the probability that such liability will be incurred. This case is analogous to those in which the validity of an insurance policy is in question. In such cases, the jurisdictional amount is measured by the face amount of the policy rather than by actual liability already incurred, without requiring a showing of the probability that the total face amount will be recovered. *Bankers Life & Casualty Co. v. Namie,* 341 F.2d 187 (5th Cir. 1965); *Guardian Life Ins. Co. of America v. Kortz,* 151 F.2d 582 (10th Cir. 1945); *Stephenson v. Equitable Life Assurance Society,* 92 F.2d 406 (4th Cir. 1937). *See generally:* Annotation: "Determination of Requisite Amount In Controversy In Diversity Action In Federal District Court Involving Liability Under, Or Validity Of, Disability Insurance," 11 A.L.R.Fed. 120, 128 *et seq.* (1972).

B. *Section 1337, Title 28, United States Code.*

■ Regardless of the amount in controversy, jurisdiction exists under Section 1337, Title 28, United States Code, which has no jurisdictional amount requirement. *Felter v. Southern Pacific Co.,* 359 U.S. 326, 79 S.Ct. 847, 3 L.Ed.2d 854 (1959); *Hales v. Winn-Dixie Stores, Inc.,* 500 F.2d 836 (4th Cir. 1974). Jurisdiction under Section 1337 may be properly invoked even though plaintiff did not plead that provision in the complaint. *May v. Supreme Court of State of Colorado,* 508 F.2d 136 (10th Cir. 1974); *Wright v. Arkansas Activities Ass'n,* 501 F.2d 25 (8th Cir. 1974); *State Highway Commission of Missouri v. Volpe,* 479 F.2d 1099 (8th Cir. 1973).

Section 1337, Title 28, United States Code, provides:

"The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress

regulating commerce or protecting trade and commerce against restraints and monopolies."

■ Whether subject matter jurisdiction can be based on Section 1337 depends on whether (1) the Reinsurance Act is an "Act of Congress regulating commerce"; and (2) this is an action "arising under" that Act.

First, the Reinsurance Act is an "Act of Congress regulating commerce." That phrase is construed to include all acts for which the commerce clause of the United States Constitution provides a constitutional basis. It is not necessary that the commerce clause be the exclusive source of federal power; " . . . it suffices that it be a significant one." *Winningham v. United States Dept. of Housing and Urban Development,* 512 F.2d 617, 621 (5th Cir. 1975); *Davis v. Romney,* 490 F.2d 1360 (3rd Cir. 1974); *Murphy v. Colonial Federal Savings and Loan Association,* 388 F.2d 609 (2nd Cir. 1967).

A review of the purposes of the Reinsurance Act demonstrates that the commerce power was a significant constitutional basis for the Act. The Act grew out of the national concern with the deterioration and stagnation of inner-city areas which were ravaged by the riots of the 1960's. *See:* Report of President's National Advisory Panel On Insurance In Riot-Affected Areas, "Meeting the Insurance Crisis of Our Cities," (1968). Congress recognized that adequate property insurance was necessary "to transform our inner city areas into viable, healthy, growing communities." House Rep.No.1585, 90th Cong., Second Sess. (1968), reprinted in 1968 U.S.Code, Cong. and Admin.News, pp. 2873, 2952. By making adequate property insurance available, Congress hoped to encourage financial institutions to extend credit to businesses; to foster increased construction, expansion, and repair of existing businesses; and to promote the establishment of new businesses in inner city areas. House Rep.No.1585, *supra;* House Rep. 91–1556, 91st Cong., Second Sess. (1970), reprinted in 1970 U.S. Code, Cong. and Admin.News, pp. 5582, 5605–5608; House Rep.No.94–60, 94th

Cong., First Sess. (1975), reprinted in 1975 U.S.Code, Cong. and Admin.News, pp. 138, 139–142. *Compare: Winningham v. United States Department of Housing and Urban Development, supra,* 512 F.2d, at 622–623.

Second, this is an action "arising under" the Reinsurance Act because it asserts a substantial claim based on, and requiring construction of, a provision of the Act. *American Federation of Labor v. Watson,* 327 U.S. 582, 66 S.Ct. 761, 90 L.Ed. 873 (1946); *Garrett v. Time-D.C., Inc.,* 502 F.2d 627 (9th Cir. 1974); *Springfield Television, Inc. v. City of Springfield, Mo.,* 428 F.2d 1375 (8th Cir. 1970).

### III. *Merits.*

#### A. *Uncontroverted Facts.*

This action challenges the validity, and application to plaintiff, of Section 1906.-21(c), Title 24, Code of Federal Regulations, which requires that insurance companies under common or interrelated management be reinsured under a single Standard Reinsurance Contract. The following facts are uncontroverted.

Plaintiff is a reciprocal interinsurance exchange organized under the laws of Missouri. See Part I, *supra.* It has approximately 4,000 subscribers who are the owners of the exchange. Plaintiff is a specialty carrier confining its risks to fire end allied lines for the forest products industry. This type of risk is particularly susceptible to arson or a civil disorder-type fire because of the combustibility of wood and lumber.

Plaintiff's attorney-in-fact and manager is U. S. Epperson Underwriting Company (hereinafter "U. S. Epperson"), a Missouri corporation. The officers of U. S. Epperson carry on the actual day-to-day operations of plaintiff, including exchange of insurance contracts among plaintiff's subscribers, classification of risks, collection of premiums, and payment of claims.

Universal is a stock fire and casualty company. Universal is a specialty carrier, which writes a major part of its business for automobile dealers, providing both fire and casualty protection.

All of the voting stock of both U. S. Epperson and Universal is owned by Management Services, Inc. All of the voting stock of Management Services, Inc., is owned by E. M. Lynn. Because of that fact, plaintiff, U. S. Epperson, Universal and Management Services, Inc., are commonly referred to as the Lynn Insurance Group.

In the 1968–69 contract year, plaintiff and Universal were reinsured under separate Standard Reinsurance Contracts. By letter dated May 5, 1969, the Federal Insurance Administrator notified the general counsel of the Lynn Insurance Group that plaintiff and Universal could continue to be reinsured under separate contracts. Accordingly, in 1969–70, 1970–71, and 1971–72, plaintiff was reinsured under a separate contract.

By letter dated September 10, 1971, the Federal Insurance Administrator notified the general counsel of the Lynn Insurance Group that because plaintiff and Universal had 19 out of 20 and 21 officers in common, commencing with the 1972–73 contract, all companies of the Lynn Group would be required to be reinsured under a single contract. The general counsel of the Lynn Group, who was also Vice-President and General Counsel of U. S. Epperson, protested the Administrator's decision. However, after the Administrator reaffirmed his decision, plaintiff and Universal accepted a single contract under protest and filed this action.

The uncontroverted facts show that plaintiff and Universal are not under common ownership. Plaintiff is owned by its 4,000 subscribers. All of the capital stock of Universal is owned by Management Services, Inc. However, the uncontroverted facts do prove that there existed several substantial management links between plaintiff and Universal as of September 10, 1971.

First, in addition to his common ownership of the voting stock of U. S. Epperson, plaintiff's attorney-in-fact, and Universal through Management Services, Inc., E. M. Lynn was President and General Manager

of U. S. Epperson, Universal, and Management Services, Inc.

Second, Universal, Management Services, Inc., and U. S. Epperson had a number of common directors. All seven of the directors of U. S. Epperson also served as directors on Universal's fifteen person board of directors.

Third, Universal, Management Services, Inc., and U. S. Epperson had a number of common officers. Seventeen persons served as officers in all three companies. One other person was an officer of both plaintiff and Universal.

Finally, plaintiff, U. S. Epperson, Universal and Management Services, Inc., along with other members of the Lynn Insurance Group, all have a single workman's compensation insurance contract and a single general liability-automobile Insurance Contract with Universal. Furthermore, both plaintiff and Universal have issued fire and extended coverage policies to Universal to insure their common office building in Kansas City, Missouri.

Despite the substantial evidence of management links between U. S. Epperson and Universal, plaintiff contends that the two organizations are separately managed in practice. The actual day-to-day operations of Universal are conducted by Universal's Executive Vice President; the Vice President, Sales; the Vice President, Underwriting; the Vice President, Claims; and the Secretary and Treasurer. Plaintiff's actual day-to-day operations are conducted through U. S. Epperson by five different persons holding substantially the same positions in U. S. Epperson's corporate organization. Plaintiff further emphasizes the fact that an advisory committee of thirteen of plaintiff's subscribers, appointed by U. S. Epperson, has power to authorize investment of funds and to adopt rules and regulations for the exchange of insurance contracts. Finally, plaintiff emphasizes the fact that the seven U. S. Epperson directors who also serve on Universal's board, are opposed on Universal's board by eight non-common directors. However, these latter facts must be given less weight in view of the power of E. M. Lynn, as controlling shareholder and president of both U. S. Epperson and Universal, to manipulate the officers and directors of each.

### B. *Conclusions of Law.*

The purpose of the Reinsurance Act is to encourage property insurers to continue to write and renew policies insuring property in areas subject to risks of large losses from civil disorders. See Part II, *supra*. Property insurance companies generally purchase reinsurance against abnormally high losses from various risks. The unusually large losses on riot and civil commotion coverage suffered in the mid-1960's by the property insurance industry threatened the continued vitality of these reinsurance arrangements and thus, in turn, the continued availability of riot insurance in urban areas.

The Reinsurance Act was designed to provide federal reinsurance for these riot losses. The Secretary of Housing and Urban Development was authorized " . . . to offer to any *insurer* or pool, . . . , reinsurance against property losses resulting from riots or civil disorders in any one or more States (emphasis supplied)." Section 1749bbb-7, Title 12, United States Code. Section 1749bbb-2(a)(4), Title 12, United States Code, provides that

"(a) . . . the term

. . . . .

"(4) "insurer" includes any insurance company or group of companies under common ownership which is authorized to engage in the insurance business under the laws of any State . . . ."

In drafting the Standard Reinsurance Contract, the Secretary substituted the term "company" in place of the term "insurer." Section 1906.21(c), Title 24, Code of Federal Regulations, provides that

"(c) 'Company' means any company authorized to engage in the insurance business under the laws of any State, except that if there are two or more companies within a State in

which reinsurance is to be provided under the contract which as determined by the reinsurer:

(1) Are under common ownership and ordinarily operate on a group basis; or

(2) Are under single management direction; or

(3) Are otherwise determined by the reinsurer to have substantially common or interrelated ownership, direction, management, or control; then all such related, associated, or affiliated companies, excluding non-admitted companies which are not specifically included by endorsement to the contract, shall be reinsured only as one aggregate entity.
. . . ."

In this action, plaintiff contends first that Section 1906.21(c), *supra,* is invalid; and second, that even if valid, the regulation could not be validly applied to it under the facts of this case.

### (1) *Validity of the Regulation.*

 Plaintiff asserts that Section 1906.21(c), *supra,* is invalid because (1) in promulgating Section 1906.21(c), the Secretary exceeded the scope of his authority under the Reinsurance Act; (2) the regulation conflicts with express provisions of the Reinsurance Act; and (3) the regulation is contrary to the purposes of the Reinsurance Act. However, it is concluded that the regulation was within the scope of the Secretary's authority under the Reinsurance Act, and that the regulation is consistent with both the provisions and purposes of the Act.

The Secretary has been delegated broad authority to issue regulations to effectuate the purposes of the Act. The general power to promulgate rules and regulations is delegated by Section 1749bbb–17, Title 12,

United States Code.[8] Specific power to establish uniform terms and conditions for the Standard Reinsurance Contract is delegated by Section 1749bbb–8(c), Title 12, United States Code, which provides:

"(c) Such contracts, agreements, treaties, or other arrangements may be made without regard to section 665(a) of Title 31, and shall include any terms and conditions which the Secretary deems necessary to carry out the purposes of this subchapter. The premium rates, terms, and conditions of such contracts with insurers or pools, throughout the country, in any one year shall be uniform."

Finally, the Secretary has been delegated specific authority " . . . to define, by rules and regulations, any technical or trade term, insofar as such definition is not inconsistent with the provisions of this title." Section 1749bbb–2(b), Title 12, United States Code. In view of this broad delegation of authority, the validity of the regulation must be determined by resort to the language, legislative history, and purposes of the Reinsurance Act.

Section 1749bbb–2(a)(4), Title 12, United States Code, quoted above, provides that as employed in the Act, the term " 'insurer' *includes* any insurance company or group of companies under common ownership . . . ." (emphasis supplied). The Secretary contends that by using the term "includes" rather than "means," Congress intended to authorize the Secretary to expand the definition of "insurer" beyond single insurance companies and groups of companies under common ownership. Plaintiff invokes the doctrines of ejusdem generis and *expressio unius est exclusio alterius,* and contends that the Secretary was not authorized to extend the term "insurer" beyond the general class enumerated in the statute, i. e., single companies and groups of companies under common ownership.

8. Section 1749bbb–17 provides, in pertinent part:

"In the performance of, and with respect to, the functions, powers, and duties vested in him by this subchapter, the Secretary shall (in addition to any authority otherwise vested in him) have the functions, powers, and duties (including the authority to issue rules and regulations) set forth in section 1749a, except subsections (c)(2), (d), and (f), of this title."

In drafting the definitions under Section 1749bbb–2, *supra,* Congress employed the term "includes" in respect to four definitions and the term "means" in respect to nine definitions. When the word "includes" is used in this context, it is generally used as a term of enlargement, not of limitation, and the reference to certain entities or categories is not intended to exclude all others. *Helvering v. Morgan's, Inc.,* 293 U.S. 121, 55 S.Ct. 60, 79 L.Ed. 232 (1934); *American Surety Co. v. Marotta,* 287 U.S. 513, 53 S.Ct. 260, 77 L.Ed. 466 (1933); *United States v. Gertz,* 249 F.2d 662 (9th Cir. 1957). *See also: Federal Land Bank v. Bismark Lumber Co.,* 314 U.S. 95, 62 S.Ct. 1, 86 L.Ed. 65 (1941); *American Federation of Television & Radio Artists v. N. L. R. B.,* 149 U.S.App. D.C. 272, 462 F.2d 887 (1972). It is therefore concluded that the statutory definition of "insurer" does not expressly preclude the Secretary from enlarging the category of "insurers" under the Reinsurance Act.

■ Because the Secretary has been delegated broad authority to promulgate regulations, and because the statute does not expressly conflict with the regulation in · question, the appropriate standard of review is whether the regulation is reasonably related to the purposes of the authorizing statute. *Mourning v. Family Publications Service,* 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973); *Thorpe v. Housing Authority of City of Durham,* 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969); *Graham v. National Transportation Safety Board,* 530 F.2d 317 (8th Cir. 1976). In applying this standard, the Secretary's interpretation of the Reinsurance Act is entitled to great deference. *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Graham v. National Transportation Safety Board, supra.* · Plaintiff must necessarily shoulder a heavy burden in attacking the Secretary's interpretation of the statute. *Johnson's Professional Nursing Home v. Weinberger,* 490 F.2d 841 (5th Cir. 1974); *Review Committee, Venue VII, etc. v. Willey,* 275 F.2d 264 (8th Cir. 1960).

The Secretary's goal in including companies under common or interrelated management in the definition of "company" in the regulation was to prevent insurance companies with complex organizational structures from manipulating their participation in the Reinsurance Act by engaging in either selective reinsuring or selective placement of risks. Selective reinsuring occurs when two or more related insurance companies determine which of them has the bulk of high risk policies, and then proceed to have only that company reinsured. Selective placement of risks involves the intentional placement of high risk business of a group of related insurance companies into one of the companies of the group. These manipulative practices can adversely affect the reinsurance program by penalizing non-manipulating companies in several ways.

First, the excess aggregate losses of reinsured parties are paid out of the National Insurance Development Fund. Section 1749bbb–13, Title 12, United States Code. Increases in reinsurance recoveries resulting from manipulative practices will cause increased depletion of the Fund and thereby impair its capacity to meet future needs.

Second, under the formula specified in the Standard Reinsurance Contract for computing premiums, all reinsured parties will become obligated to pay additional premiums if the total amount of all excess aggregate losses paid by the reinsurer under all contracts for the contract period exceeds the total amount of all aggregate basic premiums paid under all contracts for that period. Section 1906.26, Title 24, Code of Federal Regulations. The manipulative practices can have the effect of increasing excess aggregate losses or of decreasing premiums to the point that all reinsured parties would become obligated to pay additional premiums.

Third, if the manipulation causes the total amount of excess aggregate losses ever paid in any State to exceed the total amount of reinsurance premiums paid by all parties ever reinsured under the Reinsurance Act in that state, each currently rein-

sured company in that state could become obligated to pay an assessment specified in Section 1906.27, Title 12, Code of Federal Regulations.

Fourth, if such manipulation causes the total amount of all excess aggregate losses paid in the state to exceed the amount of premiums or assessments paid in the state, the state is required to make a reimbursement payment to the Secretary for the credit of the National Insurance Development Fund. Section 1749bbb–9(a)(1), Title 12, United States Code; Section 1906.36, Title 24, Code of Federal Regulations.

Finally, if excess aggregate losses are so large that the National Insurance Development Fund is jeopardized, the Secretary could be forced to use his authority to borrow directly from the United States Treasury to pay reinsurance obligations. Section 1735d, Title 12, United States Code. Such loans must be repaid by increasing subsequent reinsurance premiums for all reinsured parties. Section 1749bbb–13(a)(3), Title 12, United States Code.

Inclusion of companies under common management within the definition of "company" not only serves to decrease the cost of property insurance premiums, it also provides for uniformity of treatment of companies in a position to engage in manipulative practices consistent with the Secretary's duty to make the terms and conditions of reinsurance contracts uniform. Section 1749bbb–8(c), Title 12, United States Code. Congress precluded companies under common ownership from engaging in manipulative practices by including commonly owned companies in the definition of "insurer" in the Reinsurance Act. Section 1749bbb–2(a)(4), Title 12, United States Code. But, Congress did not include companies under common management within that definition, thus permitting such companies to engage in manipulative practices unless precluded by regulation.

Plaintiff asserts that reinsuring companies under common management in a single reinsurance contract increases the risks of such companies by increasing their net retention or deductible without corresponding benefit from shared premium income, thus resulting in higher premiums for property insurance. However, higher premiums can also result from the manipulative practices set forth above. The Secretary must choose which represents a greater danger of increased premiums. The courts must defer to the informed judgment and experience of the official to whom authority to make that decision is delegated. *Mourning v. Family Publications Service,* 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973); *Udall v. Tallman, supra.*

Plaintiff also contends that even if the regulation is valid under some circumstances, its purpose is not served under the circumstances of this case since plaintiff and Universal do not insure the same types of risks and thus the opportunity for manipulation is not present. Plaintiff confines its risks to the wood products industry while Universal insures primarily automobile dealers. However, because the degrees to which companies under common management insure the same risks will vary widely, the Secretary is not required to tailor the regulation so that not one blameless company will be subject to reinsurance with other companies under a single contract. *Mourning v. Family Publications Service, supra,* 411 U.S., at 374, 93 S.Ct., at 1663, 36 L.Ed.2d, at 332.

Because the purpose of the regulation is to maintain reinsurance, and accordingly, property insurance, premiums at the lowest possible rates, it is concluded that the regulation is reasonably and directly related to the purposes of the Reinsurance Act.

*(2) Application of the Regulation to Plaintiff.*

■ Because the regulation has been determined to be valid, the only remaining issue is whether plaintiff and Universal have a substantially common or interrelated management or control. The uncontroverted facts show that on September 10, 1971, plaintiff's manager and attorney-in-fact, U. S. Epperson, and Universal were dominated

by a single individual, E. M. Lynn; that all of U. S. Epperson's directors were also directors of Universal; that eighteen persons were officers of both U. S. Epperson and Universal; and that both plaintiff and Universal participated in several insurance transactions together. Although the day-to-day operations of plaintiff and Universal were conducted by different persons, those persons were subject to the direct control of E. M. Lynn. Because of the substantial degree of interrelation between plaintiff's attorney-in-fact and Universal, it cannot be concluded that the Secretary's determination that plaintiff and Universal had a common or interrelated management was unreasonable, arbitrary, capricious, or an abuse of discretion.

For the foregoing reasons, it is therefore

ORDERED that defendant's motion for summary judgment be, and it is hereby, granted. It is further

ADJUDGED that plaintiff be, and it is hereby, denied all relief prayed for in the complaint.