608 F.2d 108
 102 L.R.R.M. (BNA) 2531, 87 Lab.Cas. P 11,600
 NEWPORT NEWS SHIPBUILDING AND DRY DOCK COMPANY, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
United Steelworkers of America, AFL-CIO, Intervenor.
PENINSULA SHIPBUILDERS ASSOCIATION, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
United Steelworkers of America, AFL-CIO, Intervenor.
Commonwealth of Virginia, Amicus Curiae.
 Nos. 79-1393, 79-1400.
 United States Court of Appeals,
Fourth Circuit.
 Argued Sept. 12, 1979.
Decided Oct. 11, 1979.
 
 Andrew M. Kramer, Washington, D. C. (Deborah Crandall, Seyfarth, Shaw, Fairweather & Geraldson, Washington, D. C., on brief), for petitioner Newport News Shipbuilding & Dry Dock Co.
 E. D. David, Newport News, Va. (Herbert V. Kelly, Harry J. Kostel, Meryl D. Moore, Marla Joy Melman, Jones, Blechman, Woltz & Kelly, P. C., Newport News, Va., on brief), for petitioner Peninsula Shipbuilders' Association.
 Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C. (John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Standau E. Weinbrecht, Washington, D. C., on brief), for respondent National Labor Relations Board.
 Carl B. Frankel, Washington, D. C. (Bernard Kleiman, Chicago, Ill., Bredhoff, Gottesman, Cohen & Weinberg, Washington, D. C., on brief), for intervenor United Steelworkers of America, AFL-CIO.
 Before HAYNSWORTH, Chief Judge, WINTER, Circuit Judge, and KAUFMAN,* District Judge.
 WINTER, Circuit Judge:
 
 
 1
 The petition of Newport News Shipbuilding and Dry Dock Company (the Company) to review and set aside a supplemental order of the Board directing it to bargain, and the Board's cross-petition to enforce the order, bring to us once again the question of the validity of the election which resulted in the certification of United Steelworkers of America (the Union) as the bargaining representative of the Company's 19,000 production and maintenance employees. In deciding a previous petition for review, we withheld enforcement of the initial bargaining order and directed the Board to conduct further proceedings to consider whether there is a reasonable likelihood that the election was corrupted by chain voting. Newport News Shipbuilding & Dry Dock Co. v. N. L. R. B., 594 F.2d 8 (4 Cir. 1979). In supplemental proceedings, the Board has found that there was not a reasonable likelihood that the election was corrupted by chain voting. We think that there is substantial evidence in the record as a whole to support this finding, and we therefore now enforce the Board's order. We also grant the Board's motion to dismiss the petition for review of another union which was unsuccessful in the representation election.
 
 I.
 
 2
 The details of the election of the Union as the bargaining agent for the Company's employees and the events that followed are set forth in our prior opinion. It suffices to say that the validity of the election was vigorously attacked both by the Company and by Peninsula Shipbuilders Association (PSA), another union which had previously been the bargaining agent and which would be displaced if the election resulting in the certification of the Union were upheld. Aside from charges of misconduct on the part of the Union in the pre-election campaign and in the actual voting, the Company and PSA, in the prior proceeding, sought to void the election on the grounds, singly and collectively, that (a) election observers brought lists of voters into the polling areas, (b) politicking occurred at polling areas, (c) Board agents displayed partiality in their conduct toward election observers, (d) Board agents failed to permit adequate identification of voters, (e) Board agents inadequately protected custody of blank ballots and ballot boxes, and (f) the tally of ballots was inaccurate. 594 F.2d at 10. These charges and the others that were made had been dismissed by the Board without an evidentiary hearing.
 
 
 3
 In addition to some evidence to support the charges that we have recited, there was evidence, developed as a result of the Regional Director's investigation of the objections, that there was a stack of blank ballots in a voting booth at one of the polling places and that blank ballots were found in trash receptacles outside the polls after the election. This evidence led us to conclude that an evidentiary hearing was necessary "to consider whether there is a reasonable likelihood that the election was corrupted by chain voting." 594 F.2d at 12. We reasoned that the use of paper ballots always entails the risk of chain voting, and that when there was evidence of blank ballots outside of polling places, combined with suggestions that a substantial number of blank ballots was left in voting booths and that the Board could not account for all ballots, a hearing to determine the reasonable likelihood of chain voting was essential. We directed that if chain voting was established, the election should be set aside.
 
 
 4
 In directing a hearing with respect to the reasonable likelihood of chain voting, we limited the scope of the hearing. Having considered all of the various grounds of alleged invalidity of the election and the fact that the Board had not deemed that an evidentiary hearing was required for any of them, we stated:
 
 
 5
 The Board need not conduct an evidentiary hearing on any of the other objections (i. e., those other than possible chain voting) to the election. For reasons adequately explained by the Board, including its incorporation by reference of part of the Regional Director's report, the other objections do not raise substantial and material issues requiring a hearing.
 
 
 6
 594 F.2d at 12.
 
 
 7
 Pursuant to our mandate, the Board conducted an evidentiary hearing. Although there was evidence that on two occasions a voter was inadvertently handed more than one ballot, that challenged voters were permitted to insert their ballot in an envelope outside of the presence of election observers, that 9 more employees were recorded as casting ballots than the number of ballots actually cast, that pieces of ballots were found after the election outside of two polling places in a dumpster and in a trash receptacle, and that some unmarked ballots were found during the election by voters in four polling places, the Board found that, while "the opportunity for chain balloting did exist," the possibility "was more theoretical than practical On the facts of this case." (Emphasis added.) It therefore reached the conclusion that the evidence did not establish a reasonable likelihood that the election was corrupted by chain balloting, but established rather "that a chain balloting scheme was Unlikely to have occurred." (Emphasis added.) The Board reaffirmed its certification of the Union as the representative of the production and maintenance employees and reaffirmed its order to the Company to bargain.
 
 II.
 
 8
 In passing upon the sufficiency of the evidence to support the Board's findings, we are met at the outset with a semantical argument concerning the meaning of our mandate in the previous case. Our remand directed the Board to consider "whether there is a Reasonable likelihood that the election was corrupted by chain voting" (emphasis supplied), adding that, if a reasonable likelihood was shown, the Board should set aside the election. The administrative law judge interpreted this instruction to require the Company and PSA to establish a "reasonable probability" of chain voting if they were to be successful in sustaining the invalidity of the election. He concluded that "reasonable likelihood" must mean something more than "reasonable opportunity." He therefore assayed the evidence under a "reasonable likelihood" test, rejecting the reading advanced by the Company and PSA because it would require that the election be set aside on what amounts to proof of ample opportunity, in terms of available unmarked ballots, for chain voting.
 
 
 9
 The Company attacks the correctness of this interpretation. It asserts that established authority in Board adjudications requires that an election be set aside if there is a reasonable "possibility" that an irregularity has taken place. PSA takes an even more extreme view. It argues that "reasonable likelihood" is proven if there is "some" likelihood that chain voting occurred.
 
 
 10
 We think that the administrative law judge and the Board correctly interpreted our mandate and the language of our opinion on which it issued. We sought to deal with realities and not to upset the apparent choice of a majority of the voters who participated in the election on anything other than proof that there was a reasonable probability that the apparent choice was corrupted. We did not intend that the election be set aside Merely on the basis that it was possible that the choice had been corrupted or that there was an opportunity to corrupt the choice. Of course, many authorities use the term "reasonable possibility" in describing the applicable burden of proof, but as pointed out in Polymers, Inc. v. NLRB, 414 F.2d 999 (2 Cir. 1969): "(E)ach possibility must be assessed upon its own facts and circumstances . . . . A Per se rule of possibility would impose an overwhelming burden in a representation case. If speculation on conceivable irregularities were unfettered, few election results would be certified, since ideal standards cannot always be attained." 414 F.2d at 1004. Thus we think that "reasonable likelihood" (as used by us), "reasonable probability" (as used by the Board), and "reasonable possibility" (as used in decided cases) are largely synonymous. Each makes determinative of the validity of an election what is likely to have occurred under the particular facts of that election rather than what theoretically might have happened.
 
 
 11
 Approving as we do the Board's interpretation that "reasonable likelihood" as employed by us is synonymous with "reasonable probability," we have little difficulty in concluding that the Board's determination that chain voting was "unlikely" or "virtually nonexistent" is supported by substantial evidence. Two voters did receive more than one ballot in the voting place and one cast two ballots while the other destroyed the excess ballots. The record thus reveals only one instance in which an excess vote was cast, but because the Union prevailed by more than 1,500 votes, its majority could not be affected. Although some challenged voters were permitted to insert their ballots in envelopes out of the presence of election officials, the administrative law judge examined the challenged ballot envelopes In camera and ascertained that each contained a ballot. The discrepancy between the actual ballots cast and the number of employees who were recorded as casting ballots was only 9, and it could not adversely affect the Union's majority.
 
 
 12
 Of course evidence of torn ballots outside of polling places after the election and the evidence of some unmarked ballots found in polling places during the election would give rise to the possibility of chain voting, but we are in agreement with the Board that the possibility was more theoretical than real. Because the Company was in operation on the day of the election, voting was conducted in shifts, and the size of the electorate was unusually large. A schedule of when and where given employees were to vote was prepared and there was substantial adherence to it and to other election procedures. As the opinion of the administrative law judge persuasively demonstrates, the logistics of conducting this election and the requisites of a successful scheme of chain voting were simply incompatible, especially if the fact that chain voting was going on was to be concealed. Despite the fact that (a) over 16,000 employees voted, (b) the Company began a thorough investigation as to the validity of the election immediately after it was concluded, and (c) PSA was an active and adverse contender in the election polling over 7,000 votes, there was no direct evidence from any of the approximately 90 witnesses who testified at the supplemental hearing indicating that chain voting had occurred. There was no testimony that anyone witnessed a single ballot being passed from one voter to another, or that any voter had been approached or solicited to engage in a scheme of chain voting.
 
 
 13
 We therefore conclude that substantial evidence in the record as a whole supports the Board's finding that there is not a reasonable likelihood that the election was corrupted by chain voting.
 
 III.
 
 14
 The Company also argues that the Board improperly confined itself to the issue of chain voting in the supplemental proceedings and that it should have taken cognizance of other evidence of irregularities which the Company argues require that the election be set aside. In our view, this argument runs counter to our mandate in the previous case. But, in any event, this is not a proper case for further proceedings.
 
 
 15
 As we have shown, we previously considered the Company's evidence of other irregularities in the election and, in agreement with the Board, concluded that it was legally insufficient to warrant a hearing. Because of that conclusion, we stated that on remand the Board "need not conduct an evidentiary hearing on any of the other objections . . . the other objections do not raise substantial and material issues requiring a hearing." 594 F.2d at 12. Thus, the Company's argument that the Board should have considered the evidence of other irregularities should be rejected.
 
 
 16
 But even if we assume that there may be a case in which it would be appropriate for the Board, after uncovering on remand either evidence of infractions that are unknown at the time of the original proceedings or new and substantial evidence of infractions previously charged but inadequately supported, to reexamine issues which it previously decided, this is not such a case. We have reexamined the record and briefs in the prior petition for review in the light of what the Company presently asserts are irregularities other than chain voting that invalidated this election. In this connection, our task has not been aided by a singular lack of specificity on the part of the Company as to what these irregularities were. But, to the extent that we have been able to identify them from the argument in the Company's briefs, we find the following:
 
 
 17
 1. In its brief in the instant review, the Company appears to argue that the validity of the election was adversely affected because the staffs of Board members participated in the election. It is by no means clear that that contention was advanced as an exception in the original petition for review, or that any exception which was advanced is broad enough to include it. If that is the case, then the Company is foreclosed from asserting it now by virtue of 29 U.S.C. § 160(e). On the other hand, if that contention was advanced in connection with the original petition for review, we do not perceive that any new or additional evidence was developed in the proceedings on remand that would warrant reconsidering it.
 
 
 18
 2. The Company presently contends that blank ballots were accessible to voters. The original objections to the election, the Regional Director's report, and the Board's report in the previous petition for review reveal that this contention was advanced previously. It was decided adversely to the Company before the Board and by us. We conclude that this issue should not be reopened. While it is true that the evidence at the supplemental hearing showed that a greater number of blank ballots was accessible to voters than did the proof tendered by the Company in support of its initial objections to the election, we cannot say that the number was so great that it proved stuffing of ballot boxes. Especially is this so when the discrepancy between the number of ballots cast and the number of employees recorded as voting was in favor of the latter, and when the Union's majority was in excess of 1,500.
 
 
 19
 3. The Company contends that polling places and ballot boxes were left unattended for a length of time. This objection was thoroughly litigated in the prior proceedings before the Board and decided against the Company by us in the previous petition for review. We do not think that it should be reopened.
 
 
 20
 4. The Company asserts that some voters obtained more than one blank ballot. This contention, too, was thoroughly litigated in the prior proceedings. It was reexamined by the Board on remand with respect to the issue of chain voting, and we think that the Board has correctly found that the two incidents of voters actually receiving more than one ballot were as the result of inadvertence and were De minimis.
 
 
 21
 5. The Company renews the objection that the vote tally shows more voters than ballots cast. This fact standing alone has received thorough consideration and was held not to invalidate the election in the prior petition for review. To the extent that it is a circumstance bearing on the possibility of chain voting, we think that it was correctly considered and decided against the Company in the proceedings on remand after the first petition for review. It, too, should not be reopened.
 
 
 22
 Overall, we think that the Board's order directing the Company to bargain is supported by substantial evidence and it and the proceedings leading to its adoption were without legal error. We will therefore grant enforcement.
 
 IV.
 
 23
 In No. 79-1400, PSA has sought review of the Board's supplemental order, and the Board has sought to dismiss the petition on the familiar principle that PSA is not a person aggrieved by the bargaining order within the meaning of § 10(b) of the Act, 29 U.S.C. § 160(b). See American Fed. of L. v. N. L. R. B., 308 U.S. 401, 411-12, 60 S.Ct. 300, 84 L.Ed. 347 (1940). We grant the motion.
 
 
 24
 PSA appeared as an Amicus curiae in the initial proceedings before the Board and in the first petition for review before us. When the case was returned to the Board, PSA sought to intervene as a party-participant, but the Board initially denied its motion and gave it permission to intervene only as Amicus curiae. PSA then sought relief from the United States District Court for the Eastern District of Virginia which entered an order stating that it would enjoin any further proceedings conducted by the Board if PSA were not afforded the status of a full party. A panel of this court declined to review the correctness of the district court's order by a writ of mandamus. The Board then amended its prior order which had permitted PSA to participate only as Amicus curiae and gave it "full party status . . . on the election objection issue concerning whether there was a reasonable likelihood that the election was corrupted by chain voting."
 
 
 25
 Of course, the proceeding before the administrative law judge and the Board on remand was both a nonappealable § 9 proceeding, 29 U.S.C. § 159, to determine the representative of the Company's employees, and an appealable § 10 proceeding, 29 U.S.C. § 160, to determine if the Company had committed an unfair labor practice when it refused to bargain with the Union. Indeed, the Board's order under review in the instant proceeding certifies the Union, pursuant to § 9, as the bargaining representative of the Company's employees and reaffirms, pursuant to § 10, that the Company committed an unfair labor practice when it refused to bargain with the Union.
 
 
 26
 Except for the order of the district court, this case is not different from the ordinary one in which a losing union is not a party in which an unfair labor practice for refusing to bargain is adjudicated against the employer, and the winning union has a right to intervene, and often does so. The order of the district court is not specific as to whether PSA is to be treated as a party in the representation aspect of the case or the unfair labor practice aspect of the case, or both. The order of the Board appears to limit PSA's participation solely to the representation case. We think that, to the extent that the district court directed that PSA be a party to the unfair labor practice aspect of the case, the order was in excess of the district court's jurisdiction. As a consequence, we think that PSA stands in shoes no different from any union which has lost an election with respect to an unfair labor practice case against the employer for refusing to bargain with the winner. As we have said, the rule there is that the losing Union is not an aggrieved party, and it has no right to seek review of the Board's order.
 
 
 27
 No. 79-1393 ENFORCEMENT GRANTED.
 
 
 28
 No. 79-1400 PETITION FOR REVIEW DISMISSED.
 
 HAYNSWORTH, Chief Judge, concurring:
 
 29
 I am disturbed that the Board concluded that under the terms of the remand order it was required to apply a more restrictive standard than it regularly applies in considering the fairness of representation elections and that it was foreclosed from considering extensive evidence of the presence of blank ballots except insofar as that bore upon the possibility of chain voting. In my view, the Board should have considered the new evidence of irregularity in the handling of blank paper ballots insofar as it bore upon the validity of the election in any other respect, notwithstanding the earlier focus of the concern of this court upon the possibility of chain voting.
 
 
 30
 The evidence of the presence of blank paper ballots presented during the hearing was much more extensive than that earlier proffered. A greater number of polling places was involved. Nevertheless, the fact that there were more voters than ballots cast, the fact that only two voters testified that they were given more than one ballot, and of those only one cast two ballots, convinces me there was no possibility that ballot boxes were stuffed. Moreover, the absence of any testimony of any solicitation or participation in chain voting satisfies me there was no possibility of chain voting and that the Board would have declined to set aside the election no matter the standard of review it applied.
 
 
 31
 Hence, I concur in substantial part in Judge Winter's opinion and in the judgment.
 
 
 
 *
 Honorable Frank A. Kaufman, United States District Judge for the District of Maryland, sitting by designation