FELTER *v.* SOUTHERN PACIFIC CO. ET AL.

No. 269.   Argued March 24, 1959.—Decided April 27, 1959.

*Harry E. Wilmarth* argued the cause for petitioner. With him on the brief were *Roland C. Davis* and *V. Craven Shuttleworth.*

*Clifton Hildebrand* argued the cause and filed a brief for respondents. *George L. Buland, Burton Mason* and *W. A. Gregory* were on a brief for the Southern Pacific Co., respondent.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The Railway Labor Act[1] was amended in 1951 to authorize labor organizations representing employees of

---

[1] The Act is c. 347, 44 Stat. 577, c. 691, 48 Stat. 1185, as amended, 45 U. S. C. §§ 151–163.  The Act was originally enacted in 1926 and considerably rewritten in 1934.

carriers to make "checkoff" agreements with the carriers for the deduction from employees' wages of periodic dues, initiation fees and assessments. Section 2 Eleventh (b), as added by 64 Stat. 1238, 45 U. S. C. § 152 Eleventh (b).[2] The amendment contains a proviso "[t]hat no such agreement shall be effective with respect to any individual employee until he shall have furnished the employer with a written assignment to the labor organization . . . *which shall be revocable in writing* after the expiration of one year . . . ." (Emphasis supplied.) In this case the Dues Deduction Agreement between respondents Brotherhood of Railroad Trainmen and Southern Pacific Company required that there be used, as a necessary form for revoking an assignment, nothing other than a writing executed on a form furnished by the Brotherhood of Railroad Trainmen and forwarded by that organization to the employer.[3] The petitioner challenges this contractual

---

[2] The amendment added a new paragraph to § 2 of the Act, § 2 Eleventh.

[3] The contract provision is as follows: "Both the authorization forms and the revocation of authorization forms shall be reproduced and furnished as necessary by the Organization without cost to the Company. The Organization shall assume full responsibility for the procurement and execution of the forms by employes and for the delivery of such forms to the Company."

The Trainmen's position, concurred in by the company, is that this provision means that no revocation cards are to be recognized "except those reproduced by our organization." While this construction of the agreement is hardly an obvious one, it is the construction put on the agreement by the parties to it, the Southern Pacific and the Trainmen, and since petitioner in this suit does not question it as a matter of construction, we of course accept it here.

Since there was no question of interpretation or application of the collective agreement, but rather only one of its validity under the statute, the case is not one in which resort to the grievance and Adjustment Board machinery provided by the Railway Labor Act was required. "This dispute involves the validity of the contract, not its meaning." *Brotherhood of Railroad Trainmen* v. *Howard,* 343

regulation as violative of the employee's statutory right to revoke the assignment. The District Court for the Northern District of California held that the requirement was valid, reasoning that although it "may seem a bit arbitrary" to allow revocation only by means of the form provided by the Trainmen, it was "no burden" and was "easily complied with." 155 F. Supp. 315, 317. The Court of Appeals for the Ninth Circuit adopted the District Court's reasoning and affirmed. 256 F. 2d 429. We granted certiorari to consider the important question of the scope of the proviso of § 2 Eleventh (b). 358 U. S. 812.

The petitioner is employed by respondent, Southern Pacific Company, and through March 1957 was a member of respondent Brotherhood of Railroad Trainmen. He had executed an individual assignment authorizing the check-off in his case. In March 1957, more than a year after his assignment had been in effect, petitioner decided to join the Order of Railway Conductors and Brakemen. He notified the Trainmen of his resignation by letter dated March 30, 1957, advising them that he was revoking the authorization to check off his dues and that he had sent a revocation form to the company. The same day a representative of the Conductors sent petitioner's executed revocation form to the company and handed an executed duplicate revocation form to the Secretary-Treasurer of petitioner's Lodge of the Trainmen.

The company and the Trainmen, relying on the provisions of the Dues Deduction Agreement, declined to honor the revocation forms executed by the petitioner, though they were identical with the form which the Dues Deduc-

U. S. 768, 774. Cf. *Slocum* v. *Delaware, L. & W. R. Co.,* 339 U. S. 239, 242–244. The case presents an employee dispute as much, if not more, with the labor organization as with the employer. Cf. *Steele* v. *Louisville & N. R. Co.,* 323 U. S. 192, 205.

tion Agreement provided should be obtained from the Trainmen. The company advised that "[t]his matter is being directed to the attention of the appropriate officer of the Brotherhood of Railroad Trainmen for handling in accordance with the Agreement." The Trainmen's local Secretary-Treasurer in turn wrote the petitioner that the forms he had executed and submitted were not acceptable. He said that "the only way that you can be released from Wage Assignment Authorization is by signing a regulation A–2 card furnished by me and forwarded by me to the Company." He enclosed such a card for the petitioner's signature and noted "We would be sorry to lose you as a member of the BRT and hope that you may reconsider." As a result of the refusal of the company and the Trainmen to treat the petitioner's forms as valid, it was too late to stop the checkoff of petitioner's April 1957 wages.

The petitioner declined to execute any further forms and commenced this suit in the District Court against the company and the Trainmen. His complaint alleged that the action was brought under the Railway Labor Act, an "Act of Congress regulating commerce"; in this posture the jurisdiction of the District Court was properly invoked under 28 U. S. C. § 1337.[4] The complaint alleged that the action was brought on behalf of petitioner and others similarly situated; the parties are in dispute as to how many other employees were in fact similarly situated with petitioner, but, with the courts below, we do not find

---

[4] "The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies." This jurisdictional provision, unlike the general "arising under" statute, 28 U. S. C. § 1331, requires no monetary jurisdictional amount. See *Mulford* v. *Smith*, 307 U. S. 38, 46; *Turner, Dennis & Lowry Lumber Co.* v. *Chicago, M. & St. P. R. Co.*, 271 U. S. 259, 261.

it necessary to resolve the dispute,[5] and with them, we decide this case on the merits. The complaint prayed for a declaration that the petitioner, under the proviso, had complied with the requirements for effecting revocation and had terminated all authority of the company to check off his wages in favor of the Trainmen. Injunctive relief was also sought. The company and the Trainmen admitted that they were continuing to treat the petitioner's assignment as unrevoked, contending that the collective bargaining authority under the 1951 amendment to make checkoff agreements included authority to agree upon the challenged provisions of the Dues Deduction Agreement. We disagree with the District Court and the Court of Appeals and hold that the restrictive provisions of the Dues Deduction Agreement are violative of the 1951 amendment.

*First.* The 1951 amendment relaxed provisions of the Railway Labor Act dating from 1934 which had forbidden carriers and labor organizations from making either "union-shop" arrangements,[6] or arrangements whereby car-

---

[5] Petitioner originally listed 24 others as being similarly situated with him. The respondents stated that 11 of these were in fact not so situated. After this, petitioner listed others. If it appears in fact necessary on remand, the District Court may conduct such further investigation of the matter as will allow it to enter an appropriate judgment.

[6] Section 2 Fifth, as added by § 2, c. 691, 48 Stat. 1188, 45 U. S. C. § 152 Fifth, provided that "No carrier, its officers, or agents shall require any person seeking employment to sign any contract or agreement promising to join or not to join a labor organization . . ."; § 2 Fourth, as added by § 2, 48 Stat. 1187, 45 U. S. C. § 152 Fourth, provided that "it shall be unlawful for any carrier . . . to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization . . . ."

The 1951 amendment permitted carriers and labor organizations "to make agreements, requiring, as a condition of continued employment, that within sixty days following the beginning of such em-

riers would check off from employee wages amounts owed to a labor organization for dues, initiation fees and assessments.[7] It thus became lawful to bargain collectively for "union-shop" and "checkoff" arrangements; but this power was made subject to limitations. The limitation here pertinent is that, by force of the proviso, the authority to make checkoff arrangements does not include authority to bind individual employees to submit to the checkoff. Any agreement was to be ineffective as to an employee who did not furnish the employer with a written assignment in favor of the labor organization, and any assignment made was to be "revocable in writing after the expiration of one year . . . ." This failure to authorize agreements binding employees to submit to the checkoff was deliberate on the part of Congress. Proposals to

---

ployment, or the effective date of such agreements, whichever is the later, all employees shall become members of the labor organization representing their craft or class . . . ." Section 2 Eleventh (a), as added by 64 Stat. 1238.

[7] Section 2 Fourth, as added by § 2, c. 691, 48 Stat. 1187, 45 U. S. C. § 152 Fourth, provided that "it shall be unlawful for any carrier . . . to deduct from the wages of employees any dues, fees, assessments, or other contributions payable to labor organizations, or to collect or to assist in the collection of any such dues, fees, assessments, or other contributions . . . ."

The 1951 amendment permitted carriers and labor organizations, subject to the proviso in the text, "to make agreements providing for the deduction by such carrier or carriers from the wages of its or their employees in a craft or class and payment to the labor organization representing the craft or class of such employees, of any periodic dues, initiation fees, and assessments (not including fines and penalties), uniformly required as a condition of acquiring or retaining membership . . . ." Section 2 Eleventh (b), as added by 64 Stat. 1238.

The 1951 amendment provided that "Any provisions in paragraphs Fourth and Fifth of section 2 of this Act in conflict herewith are to the extent of such conflict amended." Section 2 Eleventh (d), as added by 64 Stat. 1239.

that end were expressly rejected. The bills originally introduced in the House and Senate, and favorably reported by the respective House and Senate Committees, would simply have authorized carriers and labor organizations "to make agreements providing for the deduction by such carrier or carriers from the wages of its or their employees in a craft or class and payment to the labor organization representing the craft or class of such employees, of any dues, initiation fees or assessments which may be payable to such labor organization." H. R. Rep. No. 2811, p. 1, and S. Rep. No. 2262, pp. 1–2, 81st Cong., 2d Sess. Indeed the House Report reveals that the choice finally made of making implementation of the checkoff a matter of individual employee assignment was at first considered and rejected; "the committee thought that the making of such assignments . . . should remain a subject for collective bargaining." [8] But the matter had been a recurrent subject of concern particularly at the Senate Hearings, and between the time of the Committee Reports and the consideration of the bill on the Senate floor, the Senate Committee reversed its view and developed the proviso [9] allowing the individual employee to decide for himself whether to submit to the checkoff, and whether to revoke an authorization after the expiration of one year. See 96 Cong. Rec. 15735, 16268.[10] In this form the bill was passed by both Houses and approved.

---

[8] H. R. Rep. No. 2811, 81st Cong., 2d Sess., p. 6.

[9] The proviso was inserted by way of an amendment which was submitted by Senator Hill on behalf of himself and Senator Taft, with the agreement of the Committee. See 96 Cong. Rec. 15735. For the reservations of the Committee members which doubtless led to this, see note 10, *infra*.

[10] At the time of the rendition of the Senate Committee Report, S. Rep. No. 2262, 81st Cong., 2d Sess., Senators Taft, H. Alexander Smith, and Donnell attached a statement of supplementary views by which they reserved the right to introduce and support on the

The structure of § 2 Eleventh (b) then is simple: carriers and labor organizations are authorized to bargain for arrangements for a checkoff by the employer on behalf of the organization. Latitude is allowed in the terms of such arrangements, but not past the point such terms impinge upon the freedom expressly reserved to the individual employee to decide whether he will authorize the checkoff in his case. Similarly Congress consciously and deliberately chose to deny carriers and labor organizations authority to reach terms which would restrict the employee's complete freedom to revoke an assignment by a writing directed to the employer after one year. Congress was specifically concerned with keeping these areas of individual choice off the bargaining table. It is plainly our duty to effectuate this obvious intention of Congress, and we must therefore be careful

floor amendments, *inter alia*, which would "cause the . . . check-off conditions of employees of industry covered by the Railway Labor Act to be in general accord with the . . . check-off conditions of employees of other industry." *Id.*, at 5. These three Senators had been among those responsible for pressing an amendment to the Senate Committee version of the Taft-Hartley Act which restored to the Senate version of that Act the provision for individual option on the checkoff which they had desired during Committee deliberation, and now found in § 302 (c) (4) of that Act, 61 Stat. 157, 29 U. S. C. § 186 (c) (4). See S. Rep. No. 105, 80th Cong., 1st Sess., p. 53. The provision finally enacted in the Railway Labor amendment was quite similar to that of the Taft-Hartley Act.

For the concern with the matter at the Senate hearings, see Hearings before a Subcommittee of the Committee on Labor and Public Welfare, United States Senate, on S. 3295, 81st Cong., 2d Sess., pp. 74, 86, 94, 173, 188, 208. Senator Donnell was primarily concerned with the point. *Id.*, at 74, 86, 94, 188.

There were a few references to the matter at the House hearings. See Hearings before the Committee on Interstate and Foreign Commerce, House of Representatives, on H. R. 7789, 81st Cong., 2d Sess., pp. 33, 91, 261.

not to allow the employee's freedom of decision to be eroded in the name of procedure, or otherwise. We see no authority given by the Act to carriers and labor organizations to restrict the employee's individual freedom of decision by such regulations as were agreed upon in the Dues Deduction Agreement. The question is not whether these restrictions might abstractly be called "reasonable" or not.

*Second.* It is argued that the requirement that the revocation notice be on a form provided by the Trainmen is necessary in the interests of orderly procedure, and that the collective agreement provision was an appropriate place to specify this procedure. We might note that the original Committee rejection of the concept of individual authorization and revocation was supported for much the same reasons—that it was inconsistent with orderly procedure—but this view did not prevail finally in the Act.[11] Of course, the parties may act to minimize the procedural problems caused by Congress' choice. Carriers and labor organizations may set up procedures through the collec-

---

[11] The House Report, note 8, *supra,* at 6, had argued: "[T]here is a stability of employment relationships in the railroad industry not found in industry generally. The committee felt that if an employee is required to become and remain a member of a labor organization as a condition of employment with a resulting obligation to pay dues, initiation fees, and assessments, and with the slight prospect of changing employment or his union affiliation within the industry no statutory requirement for individual assignments seemed necessary. Furthermore, the physical nature of railroad and airline operations would make a mandatory requirement of individual assignments an exceedingly cumbersome procedure. Employees of a single carrier are scattered over thousands of miles of territory and many are located in isolated spots where few other persons are employed. It would seem that a mandatory requirement for assignments from individual employees would result in confusion and lack of stability. . . ."

tive agreement for processing, between themselves, individual assignments and revocations received, and carriers may make reasonable designations, in or out of collective bargaining contracts, of agents to whom revocations may be sent. Revocations, after all, must be sent somewhere. And doubtless forms may be established, by way of suggestion, and means for making them available set up. But here a specific procedure was established and made mandatory, imposing requirements over and above what we can perceive to be fairly those of the statute—which are simply that there be a writing, attributable to the employee and fairly expressing a revocation of his assignment, furnished the carrier.

The respondents urge that the requirement is necessary in the interests of preventing fraud and forgery, and of obviating disputes as to the authenticity of revocation instruments. Such problems are hardly peculiar to this setting. If the company suspects fraud or forgery in a revocation, it is within its power informally to check the matter with the employee. But we think it has no power, whether pursuant to action taken jointly with the labor organization in the collective bargaining agreement or to unilateral declaration, to treat as nullities revocation notices which are clearly intended as such and about whose authenticity there is no dispute.

The Trainmen next justify the procedure as a necessary protection to the employee from himself—that is, from his desire to revoke the checkoff—and from outside undue influence to do so, presumably that of a rival organization or of management. But Congress apparently foresaw and discounted any necessity for this protection when it took the matter out of the hands of the carriers and labor organizations and left it to the employee's individual choice. It did not make any provision for preliminary correspondence or dealings between the employee and the

organization when the employee wanted to stop the check-off, whether incident to terminating his affiliation or not. The complete freedom of individual choice in this area, undampened by the necessity of such preliminary dealings with the labor organization to make it effective, may seem unfortunate to labor organizations, but it is a problem with which we think Congress intended them to live.

*Third.* There is some suggestion that, possibly apart from the provisions of the Act, because petitioner was a member of the Trainmen and represented by them in the negotiation of the bargaining agreement, he is bound here by the action of his agent, as it were, in establishing this provision. But the short answer is that the proviso makes it clear that the organization was not to function as its members' agent in waiving their statutory revocation rights; we doubt whether the right to revoke could be waived at all in advance of the time for its exercise, but in any event, a waiver through the collective agreement would, under the statute, be the last conceivably permissible. And equally lacking in merit is the suggestion that the requirement of a Trainmen-furnished form is so trivial as to make the whole controversy *de minimis* and perhaps deny petitioner and those in his position judicial redress. Additional paper work or correspondence, after he once has indicated his desire to revoke in writing, might well be some deterrent, so Congress might think, to the exercise of free choice by an individual worker. When one considers the problem in its industrial setting and recalls the fact that individual workmen are not as equipped for and inclined to correspondence as are business offices, any complication of the procedure necessary to withdraw or the addition of any extra steps to it may be burdensome. That involved here may deter employees from taking an action they might have taken if no preliminary contact with their lodge was necessary. And within the area that the Act leaves open for solicitation by rival organiza-

tions—as where no union shop has been established,[12] or within the area where even a worker under a union-shop arrangement can change affiliations, see *Pennsylvania R. Co. v. Rychlik*, 352 U. S. 480, 492–494—the matter may be far from trivial, as the facts in this case suggest. Organizational efforts are attended by persuading the recruit to drop his membership in his present union and terminate any checkoff of his wages in its favor.[13]   There may well be a difference in the weight of persuasion necessary to enlist the worker if he cannot at once effectuate his intentions through papers furnished him on the spot by the recruiting organization.  We do not say whether the "cooling off" period which the procedure insisted upon here creates would be wise or unwise as a matter of policy. It is enough to say that we believe the Act has not left

---

[12] The Act makes no formal relationship between a union-shop arrangement and a checkoff arrangement; under it the parties can negotiate either one without the other, if they are so disposed.  And of course, a labor organization member who is subject to a union-shop arrangement need not subscribe to the checkoff; he can maintain his standing by paying his dues personally.

[13] The respondents make some suggestion that petitioner was not harmed because in any event the carrier could not continue a checkoff in favor of the Trainmen after it learned that he was no longer a member.  Section 2 Eleventh (c) provides that "no [checkoff] agreement made pursuant to subparagraph (b) shall provide for deductions from his [an employee within specified categories] wages for periodic dues, initiation fees, or assessments payable to any labor organization other than that in which he holds membership."  64 Stat. 1238.  But there is no showing when the carrier received notice of petitioner's change of membership; the papers used by him to revoke the checkoff and furnished the carrier did not refer to such a change.  And of course a worker could revoke his checkoff authorization and remain a member of the same labor organization.  It is clear that Congress meant to make the checkoff machinery stand on its own feet and be independent of any machinery for changing labor organizations—notice of which would ordinarily be sent only to the organizations involved.

any place for it. We think the added requirement involved here is meaningfully burdensome when considered in context; but in any event, we do not think the Act empowered carriers and labor organizations to bargain for any restrictions on the individual's right to revoke his assignment, even if later, while insisting on them, they choose to describe them as petty.

*Reversed.*

MR. JUSTICE BLACK, with whom MR. JUSTICE FRANK-FURTER and MR. JUSTICE DOUGLAS concur, dissenting.

I would affirm the action of the District Court and the Court of Appeals in dismissing this petition for declaratory judgment and injunction. I agree, of course, that the provisions of the Railway Labor Act authorizing railroad workers to revoke their previously executed "check-off" agreements "after the expiration of one year" grant workers a right which neither Union, nor Railroad, nor both together, can take away in whole or in part. I am of the opinion, however, that the collective bargaining agreement between the Brotherhood of Railroad Trainmen (B. R. T.) and the Southern Pacific Company provides a procedure which substantially aids in the preservation of the employees' statutory right to revoke their assignments at will. Since the checkoff provisions of the Act were not designed primarily to aid the Railroad, it is natural that the governing contract between Railroad and Union should relieve the Railroad, as much as possible, of burdens and expenses. Necessarily, Congress in authorizing checkoff arrangements contemplated that they could be administered in a businesslike manner, without imposition of undue burden on the railroads. It seems plain to me that the provision of the contract requiring that revocation be made through the B. R. T. to the Railroad, on forms supplied by the B. R. T. is, on the

whole, just and practical as applied to the Railroad, the Union and its members.

But in any event, the circumstances existing here call for no exercise of a court's discretionary power either to enter a declaratory judgment or to grant an injunction. This suit was filed April 12, 1957—10 days after B. R. T. in response to petitioner's letter terminating his membership and revoking his Wage Assignment Authorization mailed to petitioner for his signature the revocation form provided for in the collective bargaining contract. At the time of filing suit petitioner had no more than a highly questionable claim for one month's dues—several dollars. He also had in his possession the B. R. T. form which would have been recognized both by the B. R. T. and the Railroad. Petitioner therefore could have avoided any future deductions, and any possible damage to himself, merely by signing and mailing that form. And he could have recovered the one month's dues, if illegally deducted, by suit against the Railroad.

Equity's extraordinary power to grant injunctive relief to prevent irreparable damage can hardly be sustained by the proof in this case; plainly enough petitioner could not show irreparable damage, and, in fact, did not even allege it. Similarly, he could not claim he lacked an adequate remedy at law. Nor would declaratory relief be appropriate, for as we have said:

> "The declaratory judgment procedure may be resorted to only in the sound discretion of the Court and where the interests of justice will be advanced and an adequate and effective judgment may be rendered." *Alabama Federation of Labor* v. *McAdory*, 325 U. S. 450, 462.

The question we finally have here, therefore, is whether the District Court and the Court of Appeals should be reversed because they refused to use the court's process

in a controversy which, in reality, is between two unions over which one's printed form shall be used to revoke an. assignment. Perhaps judicial history can produce no other case in which the extraordinary relief the Court now orders granted has been accorded under comparable circumstances. For any possible injury to petitioner would have been avoided except for his stubborn refusal to sign a simple, 11-line form identical to one he had already signed. The federal courts have too much work to do in adjudicating real, genuine, meaningful cases or controversies to have their time consumed in consideration of trivial disputes like this one. I would affirm the decisions below.