Alan C. HAYES, et al., Plaintiffs,

v.

LOCAL NO. 12, UNITED RUBBER CORK, LINOLEUM AND PLASTIC WORKERS OF AMERICA, AFL–CIO; et al., Defendants.

Civ. A. No. 80–C–0042–M.

United States District Court,
N. D. Alabama;
Middle Division.

March 27, 1981.

Donald W. Davis, Birmingham, Ala., for plaintiffs.

Clarence F. Rhea, Gadsden, Ala., William F. Gardner, Birmingham, Ala., for defendants.

## FINDINGS OF FACT, DISCUSSION, AND CONCLUSIONS OF LAW

CLEMON, District Judge.

This case raises the sole issue of whether plaintiffs and their class—production and maintenance employees of Goodyear Tire and Rubber Company's Gadsden, Alabama plant and members of Local 12, United Rubber Cork Linoleum and Plastic Workers of America—gave timely notice of the revocation of their union dues checkoff authorizations following the expiration of the 1976 collective bargaining agreement.

The case was filed in this Court on January 15, 1980. It was subsequently certified as a class action; the class consisting of

"... all persons who were employed during July-September, 1979 in skilled trades jobs by the Company and who were simultaneously members of the Union; and who, having previously executed dues checkoff authorizations, signed and submitted to the Company revocations of their authorizations during July and September, 1979."

Notice has been provided to all known members of the class.

The parties have filed cross-motions for summary judgment. The case is ripe for summary disposition since all of the operative facts are undisputed; and the defendants are entitled to judgment as a matter of law.

## FINDINGS OF FACT

Based on the stipulations of the parties, the Court makes the following Findings of Fact:

1. The defendant Goodyear Tire and Rubber Company, ("the Company") manufactures tires and rubber products at its plant in Gadsden, Alabama.

2. The defendant United Rubber, Cork, Linoleum and Plastic Workers of America, International Union ("the Union") and its designated Local 12 (Gadsden, Alabama) are the exclusive bargaining representatives of the production and maintenance workers at the Company's Gadsden Plant.

3. Negotiations for collective bargaining agreements between the Company and the Union are first conducted on a national basis, which produce a master agreement applicable to the fourteen Company plants at which the Union is the bargaining representative. At each such plant, negotiations are then conducted on a local basis with respect to local matters, which produce a local supplement agreement. Upon ratification of the local supplement agreement by the bargaining unit employees at the plant, both the master agreement and the local supplement agreement become effective at such plant. The master agreement does not become effective at a given plant until the local supplement is agreed to and ratified by the employees at the plant. The master agreement and the local supplement agreement are usually referred to together as "the agreement".

4. For a period in excess of twenty years, the collective bargaining agreements between the Company and the Union have contained a provision under which the Company agreed to deduct union dues from the earnings of employees who sign dues checkoff authorizations assigning such dues to the union.

5. Each member of the plaintiff class executed, prior to March, 1979 a dues checkoff authorization form which provided, among other things, that

Effective this date I hereby authorize:

## THE GOODYEAR TIRE & RUBBER COMPANY

to deduct from my wages and other payments specified in Article IV, Section 4(a)

of the collective bargaining agreement, and the Trustee of the SUB Fund to deduct from any Supplemental Unemployment Benefits payable to me from the SUB Fund, regular monthly membership dues in such amount as may be fixed by the Local Union in accordance with the procedure prescribed by the constitution of the International Union, and assigns such deductions to Local Union No. 12, United Rubber, Cork, Linoleum and Plastic Workers of America, as provided in the current Company-Wide Agreement and in any extension thereof as provided in said Agreement.

\* \* \* \* \* \*

This assignment and authorization shall be irrevocable for the period of one (1) year from the date hereof or until the termination of the current collective bargaining agreement between the Union and the Company, whichever is the shorter period. At the end of the original period of irrevocability, and each renewal period of irrevocability this agreement and authorization shall be automatically renewed and be irrevocable for a like period of one (1) year or until the termination of the then current agreement between the Union and the Company, whichever is the shorter, unless I give notice revoking this assignment and authorization during the ten-day period immediately following the end of such a period of irrevocability. Such a notice revoking this assignment and authorization shall be given by written notice delivered by registered mail to the Local Union and the Company.

6. In 1976, the Company and Union entered into an agreement ("1976 Agreement") which became effective on August 26, 1976. This agreement, like its predecessors, contained a dues checkoff and deduction provision which substantially tracked the language of the dues checkoff and deduction authorization quoted in the preceding paragraph.[1]

1. See Article IV(c) of the 1976 Agreement.

7. Under the express terms of both the dues checkoff and deduction authorization signed by each member of the plaintiff class *and* the 1976 Agreement, there are two discrete times at which a class member may revoke his authorization for dues deduction: (1) within ten days (known as the "window period") following the anniversary date of the original execution of the authorization, i. e., the "anniversary revocation", and/or (2) during the window period following the termination of the current collective bargaining agreement, i. e., the "non-anniversary revocation." Absent a timely revocation, each dues checkoff authorization is automatically renewed for successive one-year terms.

8. The 1976 Agreement was, by its terms, to

". . . continue in effect until and including April 20, 1979, and thereafter it shall renew itself for yearly periods unless written notice is given by either party not less than sixty (60) days, but not more than seventy-five (75) days, prior to the expiration date that it is desired to terminate or amend the agreement. In the event such notice is given negotiations shall begin within the thirty (30) day period prior to April 20, 1979. \* \* \* \* If negotiations are not completed prior to the expiration date, this agreement shall terminate unless extended by mutual agreement."

9. In 1979, the Company and the Union entered into national negotiations directed towards a new agreement, notice of an intention to terminate or amend the 1976 Agreement having been timely given. These negotiations were still in progress on April 20, 1979.

10. On April 20, 1979 the Company and the Union agreed to extend the 1976 Agreement on a day-to-day basis.

11. Agreement was reached on a national basis on July 16, 1979. Agreement was reached on the local supplement at the Gadsden Plant on September 12, 1979. The wage provisions of the 1979 Agreement were retroactive to April 23, 1979.

12. Members of the plaintiff class are among employees in maintenance jobs at the Gadsden plant who revoked or attempted to revoke their dues checkoff and deduction authorizations at various times in July, August, and September of 1979.

13. Some employees and members of the plaintiff class submitted anniversary revocations to the Company in 1979. These revocations have been honored by the Company and the Union does not question their validity. Thus, such revocations are not at issue in this cause.

14. At least one non-anniversary revocation was received from an employee of the Gadsden plant within ten days of April 20, 1979, and it has been honored by both the Company and the Union.

15. Various members of the plaintiff class submitted non-anniversary revocations within ten days following July 16, 1979—the date on which the national agreement was reached in 1979. Since the master agreement did not become effective at the Gadsden plant until the local supplement was agreed to and ratified, the Company and the Unions have not honored these non-anniversary revocations.

16. Various members of the plaintiff class submitted non-anniversary revocations within the window period following September 5, 1979—the date on which the 1976 Agreement became effective at the Gadsden plant. The Company initially honored these non-anniversary revocations, taking the position that the 1976 Agreement terminated on September 5, 1979. The Union disagreed with this position.

17. The procedure which the Company followed pending resolution of this dispute was to continue to deduct the Union dues but to place such amounts in escrow until the dispute was resolved.

18. On October 22, 1979 the Union filed a grievance with the Company under the grievance provision of the 1979 Agreement, contending that the Company was obligated to dishonor the non-anniversary revocations received in the window period following September 5, 1979 because the 1976 Agreement terminated on April 20, 1976.

19. The Company denied the Union's grievance; and the grievance was pressed to arbitration by the Union.

20. On December 14, 1979 Arbitrator R. G. Carson, Jr., issued his award sustaining the Union's grievance. The arbitrator held that under the terms of the 1976 Agreement, the termination date was April 20, 1979. Thus, non-anniversary revocations not received within the window period following April 20, 1979 were to be deemed untimely.

21. Pursuant to the award, the Company was obligated by the existing collective bargaining agreement to deduct union dues from the earnings of employees who submitted non-anniversary revocations after April 30, 1979 and to remit to the Union the funds so deducted and held in escrow. The Company has complied with the award.

22. Members of the plaintiff class are entitled to exercise their anniversary revocation rights within the appropriate window periods.

## DISCUSSION

This Court is not here called upon simply to interpret an applicable provision of the collective bargaining agreement between the Company and the Union. If such were the case, the Court's power would be severely limited, for arbitration is not merely the favored means of resolving this type of dispute, it is mandated by the national policy. *United Steelworkers v. American Manufacturing Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403; *United Steelworkers v. Enterprise Wheel and Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424; *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409. The legal principles are clear:

"The question of interpretation of the collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction which was bargained for, and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of

the contract is different from his." *Enterprise Wheel and Car Corp.*, 363 U.S. at 599, 80 S.Ct. at 1362.

Rather, this Court must determine whether the failure of the Company to honor the non-anniversary revocations either violates the Labor Management Relations Act, 29 U.S.C. § 186(c)(4), or derogates the rights of the plaintiff class members under the terms of the dues checkoff authorizations.

Section 186 of the Taft-Hartley (Labor-Management Relations) Act of 1947 generally restricts payments by employers to labor organizations or employee representatives. One of the notable exceptions to this general proscription is embodied in subsection (c)(4), which permits a company to withhold and remit dues to a union provided that

> the employer has received from each employee, on whose account such deductions are made, a written assignment which shall not be irrevocable for a period of not more than one year, or beyond the termination date of the applicable collective agreement, whichever occurs sooner.[2]

As found earlier, the dues checkoff and deduction authorization executed by each member of plaintiff's class effectively tracked the statutory language in providing two chances—one of them on an annual basis—to revoke dues authorizations.

■ Thus, members of the plaintiff class have a statutory right, independent of the collective bargaining agreement, to revoke their authorizations. In interpreting a similar provision under the Railway Labor Act, the Supreme Court has held that "Congress . . . took the matter out of the hands of the [companies] and labor organizations and left it to the employee's individual choice;" it intended to give to employees "complete freedom of individual choice." *Felter v. Southern Pacific Co.*, 359 U.S. 326 at 335, 336, 79 S.Ct. 847 at 854, 855, 3 L.Ed.2d 854

(1959). *Felter* makes it clear that the parties to a collective bargaining agreement cannot deprive an employee of his statutory right to revoke an earlier-executed dues checkoff authorization.

The dues checkoff provision of the 1976 Agreement does not restrict the statutory rights of the plaintiff class in any way. In fact, it guarantees those rights by effectively tracking the very words of the statute. As the statute requires, each class member in the case at bar is accorded the right to revoke his authorization at least once every year; and in some situations, such employees may revoke during two separate window periods in those years in which the contract terminates.[3] These are the only statutory rights to which the plaintiff class may claim entitlement in this action.

■ There is no statutory right of an employee to effect, at whatever time he pleases, a non-anniversary revocation of his authorization, for as the Fifth Circuit has appropriately observed:

> ". . . Congress sought to strike a balance between employee and union protection. In making the authorization irrevocable, at least for a limited time, 'conceivably Congress thought that a period of a year would better protect the union's position from deterioration through revocation of checkoff authorizations'. *[Sea Pak] v. Industrial Employee N.M.U.*, 300 F.Supp. 1197, 1199 (S.D.Ga.1969), aff'd, 5th Cir. 1979, 423 F.2d 1229, aff'd, 1971, 400 U.S. 985, 91 S.Ct. 452, 27 L.Ed.2d 434." *NLRB v. Atlanta Printing Specialties*, 523 F.2d 783, 787, 788 (5th Cir. 1975).

■ The parties to the 1976 agreement were free to utilize the contract termination date as the beginning of the window period for non-anniversary revocations, without offending the statutory rights of the plaintiff class. All of the parties concede that the plaintiff class may effect anniversary revocations at appropriate times during the

---

2. There is no statutory definition of the term "termination date".

3. It is conceivable that, for a particular employee, an anniversary window period may occur

simultaneously with a non-anniversary window period in the year of termination of a collective bargaining agreement.

year; the plaintiff class has stipulated that the Company has honored non-anniversary revocations received in the window period of what the arbitrator found to be the termination date of the contract.

Finding no statutory violation,[4] the Court is left with the question of whether the arbitrator's decision on the termination date of the 1976 Agreement is inconsistent with the express terms of the executed dues checkoff and deduction authorizations. It is only by virtue of these authorizations that the Company is empowered to deduct union dues from the earnings of the plaintiff class members. And to the extent that the Company failed to comply with the express terms of the authorization, the amount of any wrongful deductions must be remitted to the plaintiff class members.

The authorizations are, by their terms, irrevocable ". . . until the termination of the current collective bargaining agreement between the Union and the Company." The arbitrator has determined that the contract terminated on April 20, 1979; and that decision is binding on the parties to the 1976 Agreement since it is based on an arbitrable issue, and is neither unreasonable nor arbitrary.

Whether the decision is or should be binding on the plaintiff class depends, in the Court's view, on the intent of the class members at the time they signed or renewed the authorizations. Did they reasonably expect April 20, 1979 or some other date to be the termination date of the 1976 Agreement?

In determining the intent of the plaintiff class members, the Court must consider the facts and circumstances actually or constructively known by them at the time of execution of the authorizations.

First, since the authorizations refer to the current collective bargaining agreement, the employees knew or reasonably should have known, that the then-current collective bargaining agreement ran from August 25, 1976 to April 20, 1979. As of April 20, 1979 the agreement would either be renewed for a period of a year; or it would terminate unless extended by mutual agreement. In fact, April 20, 1979 is the only date specifically mentioned in the Termination Clause of the 1976 Agreement. It is, of course, general knowledge that in the rubber industry collective bargaining agreements typically cover three-year periods.

Under these circumstances, the Court concludes that employees who executed the authorization forms reasonably understood that the "termination" therein referred to was the termination date specified in the collective bargaining agreement. Each plaintiff class member effectively limited the revocability of his authorization to the window period following April 20, 1979. Only with the benefit of hindsight can it be said that a class member intended otherwise.

In the *Atlanta Specialties* case, *supra,* the Fifth Circuit indicated that the Congressional intent underlying the contract expiration period of revocability was to permit an employee the

". . . opportunity to reconsider at the point when the collective bargaining agreement under which he paid dues would end. At that time, either a new collective bargaining agreement would be negotiated, with terms as yet unknown, or there would be no contract in existence."

Here, as of April 20, 1979 a new collective bargaining agreement was being negotiated by the Company and the Union.

Not without significance, the 1979 Agreement was retroactive to April, 1979 for the all-important wage provisions.

Since the terms of the executed authorizations are not inconsistent with the arbitrator's decision establishing the termination date for the 1976 Agreement, the Company is required to comply with that decision and to treat as invalid any 1979 non-anniversary revocations which were not re-

---

4. There is no statutory definition of the "termination date" referred to in 29 U.S.C. § 186(c)(4).

ceived between April 20, 1979 and April 30, 1979.

## CONCLUSIONS OF LAW

1. The arbitrator's decision that the 1976 Agreement terminated on April 20, 1979 is not inconsistent with any of the rights of the plaintiff class under 29 U.S.C. § 186(c)(4).

2. The arbitrator's decision that the 1976 Agreement terminated on April 20, 1979 is not inconsistent with the terms of the dues checkoff and deduction authorizations executed by the members of the plaintiff class.

3. Based on the undisputed facts, defendants are entitled to judgment against plaintiffs and their class as a matter of law on all claims herein asserted.