663 F.2d 488
 108 L.R.R.M. (BNA) 2400, 92 Lab.Cas. P 13,010
 PENINSULA SHIPBUILDERS' ASSOCIATION, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
NEWPORT NEWS SHIPBUILDING and Dry Dock Company, Respondent.
NEWPORT NEWS SHIPBUILDING and Dry Dock Company, Appellee,
v.
PENINSULA SHIPBUILDERS' ASSOCIATION et al., Appellees,
and
National Labor Relations Board, Appellant.
 Nos. 81-1012, 81-1179 and 81-1412.
 United States Court of Appeals, Fourth Circuit.
 Argued July 15, 1981.
Decided Sept. 21, 1981.
 
 Corinna Lothar Metcalf, Eric Moskowitz, Washington, D. C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Aileen A. Armstrong, Asst. Gen. Counsel for Special Litigation, W. Christian Schumann, Washington, D. C., on brief), for N.L.R.B.
 Deborah Crandall, Washington, D. C. (Andrew M. Kramer, Susan L. Segal, Seyfarth, Shaw, Fairweather & Geraldson, Washington, D. C., on brief), for Newport News Shipbuilding & Dry Dock Co.
 Meryl D. Moore, Newport News, Va. (Jones, Blechman, Woltz & Kelly, P.C., Newport News, Va., on brief), for Peninsula Shipbuilders' Association.
 Before PHILLIPS, MURNAGHAN and ERVIN, Circuit Judges.
 JAMES DICKSON PHILLIPS, Circuit Judge:
 
 
 1
 Before us are consolidated proceedings that grow out of the refusal by Newport News Shipbuilding & Dry Dock Company (Company) to honor revocations of dues check-off authorizations by certain of its employees while they were represented by Peninsula Shipbuilders' Association (PSA). The refusal was based upon the employees' failure to use revocation forms furnished by PSA as required by section 23.2 of the collective bargaining agreement between the Company and PSA, and to follow certain other special procedures for revocation unilaterally imposed by PSA.
 
 
 2
 In a declaratory judgment action brought in district court by the Company against PSA and affected employees, the district court held inter alia that the revocation provision was valid as a matter of contract law and justified the Company's refusal. In No. 81-1412, the National Labor Relations Board (Board), as intervenor in that action, appeals the district court's judgment.
 
 
 3
 Following the district court's entry of judgment, the Board in an unfair labor practice proceeding against the Company and PSA held that the revocation provision was invalid both facially and as applied by PSA and the Company. On this basis the Board concluded that both the Company and PSA had violated section 8 of the National Labor Relations Act (NLRA), 29 U.S.C. § 158, by enforcing the provision and by continuing to check off and receive PSA dues from employees who had sought to revoke their authorizations by means other than those provided in the collective bargaining agreement and as imposed by PSA. The Board issued a cease and desist order and held the Company and PSA jointly and severally liable to reimburse those employees who had effectively revoked their check-off authorizations on non-PSA forms. In No. 80-1012, PSA petitions to review and set aside those portions of the Board's decision and order which run against it and the Board cross-applies for enforcement. In No. 81-1179, the Board applies for enforcement of those portions of its decision and order which run against the Company.
 
 
 4
 We grant enforcement to the Board's order and hold invalid any portion of the district court's declaratory judgment in conflict with the remedial aspect of that order.
 
 
 5
 * In 1975, the Company and PSA entered into a collective bargaining agreement covering the Company's approximately 19,000 production and maintenance employees. The contract was effective until June 30, 1978, and, by its terms, was extended until October 28, 1978, when the Board certified the United Steelworkers of America (Steelworkers) as the employees' bargaining agent and the winner of a representation election held in January 1978.[1] Between the election and certification dates, the Company recognized PSA as the employees' bargaining representative and it continued to check off PSA dues from the payroll checks of employees who had authorized such deductions under section 23.1 of the collective bargaining agreement.[2] The authorizations, on forms furnished by PSA, provided for the checkoff of $2.00 weekly until revoked by the employee in writing. During that same time, the Company received letters from 214 employees, on forms furnished by the Steelworkers, revoking their dues checkoff authorizations. The Company notified PSA that it would honor the revocations, but PSA threatened to sue the Company for breaching section 23.2 of the collective bargaining agreement[3] which required revocations to be on forms furnished by PSA. Consequently, the Company continued to check off and remit dues to PSA.
 
 
 6
 PSA then sent the 214 employees certified letters informing them that under the contract only PSA forms could be used to revoke checkoffs and that they must come by the PSA office on weekdays between 8:00 a. m. and 4:30 p. m. to sign those forms. PSA also issued a "Report to the Membership" on February 12, 1978, setting forth the same information. Eventually 56 of the 214 employees revoked checkoffs on PSA forms and the Company complied. Other employees testified, however, that it was difficult to obtain PSA forms because they either worked evening or night shifts when the union hall was closed or they had to go to the office, located outside the shipyard, during their noon lunch hour. The forms were not made available to employees at the plant-for example, through distribution by Company personnel or shop stewards. Finally, a few employees testified that they did not sign Steelworker revocation forms received by the Company and that they never intended to resign their PSA membership. All dues checkoffs terminated when the contract ceased on October 28, 1978.
 
 
 7
 On October 18, 1978, ten days before the contract expired, the Steelworkers filed unfair labor practice charges with the Board, alleging that the Company was violating subsections 8(a)(1) and 8(a)(3) and PSA was violating subsections 8(b)(1)(A) and 8(b)(2) of the NLRA, 29 U.S.C. § 158, by continuing to check off the dues of employees who revoked on non-PSA forms. In response, the Board informed the Company that a complaint would issue against it, but orally advised that the Board intended to dismiss the charge against PSA. Subsequently, on November 16, 1978, the Company filed a declaratory judgment action in district court against PSA, its business manager, and the 158 employees who attempted to revoke their checkoff authorizations on non-PSA forms.[4] The action sought a judicial construction of article XXIII of the collective bargaining agreement, in particular to determine what procedures under section 23.2 were necessary to revoke checkoff authorizations and whether PSA must indemnify and defend the Company under section 23.3.[5]
 
 
 8
 While the declaratory judgment action was pending in district court, the Board issued unfair labor practice complaints against the Company and PSA,[6] on January 12 and July 2, 1979, respectively, alleging inter alia that enforcing section 23.2 of the collective bargaining agreement unlawfully interfered with the employees' section 7 rights, 29 U.S.C. § 157. The Board then moved to intervene in and to stay the district court action pending the outcome of the unfair labor practice proceeding. Although the district court permitted the Board to participate at the hearing as an amicus curiae, in a decision issued October 24, 1979, it denied the Board's motion to intervene. The district court found the 158 employees, who failed to appear, in default. It then noted that no party challenged the validity of section 23.2 under the NLRA, but rather that the parties agreed the section was lawful. The district court therefore neither reached that issue nor considered it in interpreting section 23.2 as a matter of contract law. On the merits, the district court gave a declaratory judgment that section 23.2 was valid and binding in the case before it; that the Company accordingly was entitled to continue checkoffs not revoked on PSA forms; and that the Company was to be defended and indemnified by PSA under section 23.3. The Board appealed the denial of its motion to intervene and we reversed, granting the Board party status to perfect an appeal in order to protect its interests as the primary tribunal for the adjudication of unfair labor practices. Newport News Shipbuilding and Dry Dock Co. v. Peninsula Shipbuilders' Association, 646 F.2d 117 (4th Cir. 1981).
 
 
 9
 Armed with the district court decision, the Company appeared at the beginning of the unfair labor practice hearings to state that PSA would defend and indemnify it. The Company thereafter did not participate in the Board proceeding. PSA moved for dismissal of the unfair labor practice proceeding because either the district court's findings of fact were res judicata or principles of collateral estoppel barred the proceeding. Newport News Shipbuilding and Dry Dock Co., No. JD-403-80, slip op. at 10 (July 10, 1980) (appended to 253 N.L.R.B. No. 96). The administrative law judge (ALJ), however, noted that the issue before the district court was one of contract interpretation and the district court neither decided nor purported to decide the unfair labor practice question which would, of course, be within the Board's exclusive jurisdiction. Id. at 18. Accordingly, he denied the motion.
 
 
 10
 The ALJ next addressed the validity of section 23.2 of the collective bargaining agreement under subsection 302(c)(4) of the Labor Management Relations Act (LMRA), which permits the employer to withhold and remit dues to a union "Provided, That the employer has received from each employee, on whose account such deductions are made, a written assignment which shall not be irrevocable for a period of more than one year, or beyond the termination date of the applicable collective agreement, whichever occurs sooner; ...." 29 U.S.C. § 186(c)(4). The ALJ found that section 23.2 was facially unlawful because it required the employee to use only forms furnished by PSA, thus imposing a requirement over and above those of subsection 302(c)(4), in contravention of Felter v. Southern Pacific Co., 359 U.S. 326, 79 S.Ct. 847, 3 L.Ed.2d 854 (1959). In Felter, the Supreme Court had held that a contract provision, requiring an employee to use a form provided by the union in order to revoke his checkoff authorization, violated subsection 2 Eleventh (b) of the Railway Labor Act[7] because it imposed requirements beyond those of the statute and limited the individual employee's freedom to authorize or reject checkoff of his union dues. In finding Felter to be dispositive of this case, the ALJ emphasized that the Felter Court considered subsection 2 Eleventh (b) to be quite similar to subsection 302(c)(4) of the LMRA. Id. at 332 n.10, 79 S.Ct. at 852 n.10. The ALJ alternatively found that section 23.2 of the collective bargaining agreement was unlawful as applied. There was no general distribution of or access to the PSA revocation forms; neither the PSA constitution nor union bylaws mentioned the procedure for checkoff revocation; there was no formal notification to employees before 1978 as to how they could obtain the forms; and the employees could revoke only by personally appearing at the PSA hall. These were further restrictions on the employee's individual freedom of decision than those imposed by the collective bargaining agreement.
 
 
 11
 The ALJ therefore concluded that the Company violated subsections 8(a)(1) and 8(a)(3) of the NLRA, 29 U.S.C. § 158(a)(1), (3), by maintaining and enforcing section 23.2 and by continuing to check off PSA dues after receiving revocations. He also concluded that PSA violated subsections 8(b)(1)(A) and 8(b)(2), 29 U.S.C. § 158(b)(1)(A), (2), by maintaining and enforcing section 23.2, by causing the Company to continue to check off the dues of employees who submitted revocations, and by receiving and retaining those dues.
 
 
 12
 The Board affirmed the ALJ's findings and conclusions, ordered the Company and PSA to cease and desist from their unlawful conduct, and held them jointly and severally liable to reimburse the employees who had effectively revoked their checkoff authorizations on non-PSA forms. Newport News Shipbuilding & Dry Dock Company, 253 N.L.R.B. No. 96 (Dec. 12, 1980).
 
 II
 
 13
 The validity of section 23.2 of the collective bargaining agreement-as a matter of contract or labor law-was raised in both the proceedings now before us. At issue specifically was the clause requiring an employee to use a form furnished by PSA in order to revoke his checkoff authorization. In the declaratory judgment action the district court found this requirement to be valid and binding upon the contracting parties; in the unfair labor practice proceeding, the Board found it invalid both facially and as applied as a matter of national labor law. Because the Board's jurisdiction to determine whether the provision is an unfair labor practice under the NLRA is primary and exclusive, we review its decision as the dispositive one to the extent the adjudications are in conflict.
 
 
 14
 We affirm the Board's finding that section 23.2 was invalid under the LMRA as applied in this case and, therefore, we do not reach the question whether under Felter v. Southern Pacific Co., 359 U.S. 326, 79 S.Ct. 847, 3 L.Ed.2d 854, such a contract provision is on its face, per se violative of the LMRA.[8] In addition to its conclusion that the contract provision is facially invalid the Board held alternatively that the revocation procedure as actually enforced constituted an unfair labor practice under the total circumstances. There is substantial evidence on the record as a whole to support this finding. Employees had no easy, general access to PSA forms; before 1978, they were not informed as to how they should revoke their checkoff authorizations short of the clause in section 23.2 requiring the use of a PSA form; and they had to appear personally at the PSA hall in order to sign the forms and possibly to resign their PSA memberships. While there is no evidence that employees who sought to revoke were harassed at the PSA office, this additional requirement clearly could dampen the employee's freedom to choose or revoke checkoff of his union dues as provided in subsection 302(c)(4) of the LMRA, 29 U.S.C. § 186(c) (4).
 
 
 15
 Contesting the Board's findings and conclusions on this ground, PSA argues that these additional requirements were reasonable because it had serious doubts as to the authenticity of the revocations. Some forms lacked written signatures, a few employees later testified that they did not sign Steelworker forms or did not intend to resign their PSA memberships, and PSA at the time was hotly contesting the outcome of the representation election with the Steelworkers. Because of these doubts and in order to ascertain which revocations were genuine, PSA sent the 214 employees letters detailing the revocation process-appearing in person at the PSA hall to sign a PSA revocation form.
 
 
 16
 So runs PSA's argument, but when the record is assessed there is little or no evidence that PSA was motivated by any concern for ascertaining the authenticity of the revocations. PSA never mentioned its doubts to the employees or to the Company, a number of the checkoff authorization cards lacked written signatures which PSA never questioned, and the Company did not find the revocations fraudulent on their faces because it accepted them and notified PSA that it would honor them. As the Supreme Court noted in Felter, authenticity disputes are not unusual particularly when there is a contest between unions, but "(i)f the company suspects fraud or forgery in a revocation, it is within its power informally to check the matter with the employee." 359 U.S. at 335, 79 S.Ct. at 854. The checkoff authorization cards-the actual assignment contracts between the individual employees and the Company-did not authorize PSA to reject revocations under any circumstances, including doubts as to their authenticity. Therefore, we must reject PSA's contention that its actions were reasonable in this case.
 
 
 17
 Because there is substantial evidence that section 23.2 was applied unlawfully, we grant full enforcement to the Board's order, including that portion requiring the Company and PSA, as parties jointly and severally liable, to make reimbursement of the checked-off dues to the 141 employees who have verified their revocations on non-PSA forms and to those other employees who may now be determined to have executed similar effective revocations. To the extent that the district court's judgment might be interpreted to exonerate either PSA or the Company from any liability to make reimbursement to these employees under the Board's order, or otherwise to conflict with this opinion, we hold that it is invalid and of no effect.[9]
 
 
 18
 ENFORCEMENT GRANTED.
 
 
 
 [1]
 The election outcome was disputed. In late 1979, this court ruled that the Steelworkers had won. Newport News Shipbuilding and Dry Dock Co. v. NLRB, 608 F.2d 108 (4th Cir. 1979)
 
 
 [2]
 Section 23.1. Check Off and Transmittal. Upon the written individual and voluntary authorization in accordance with law of an employee who is a member of the Association, and in no way as a condition of employment, the Company will make payroll deduction of the required monthly dues (uniform in amount) of the Association in accordance with the said authorization. The Company will deliver the sums so deducted to the Association, upon its written receipt therefor
 
 
 [3]
 Section 23.2. Revocation of Check Off Authorization. (a) Any such dues check off authorization (as provided by section 23.1) shall not be for a period of time greater than one year or the termination date of this Agreement, whichever is the sooner. A revocation of such authorization shall be by use of the form furnished by the Association (in duplicate) and shall be delivered either to the Association or to the head of the Company's Personnel and Industrial Relations Division. If such revocation is to be effective upon the termination date of this Agreement, it shall be delivered within the last fifteen (15) days of the term of this Agreement
 (b) The above-mentioned authorization, the receipt and notice of cancellation shall be in form and substance satisfactory to the Company.
 
 
 [4]
 Jurisdiction was based on sections 301 and 302 of the Labor Management Relations Act (LMRA), 29 U.S.C. §§ 185, 186, and 28 U.S.C. §§ 1331, 2201-2202
 
 
 [5]
 Section 23.3. Indemnification. The Association shall indemnify, defend and hold the Company harmless against any claim or liability arising out of the administration of this Article
 
 
 [6]
 The Regional Director initially dismissed the charge against the PSA but, after a successful appeal by the Steelworkers, he issued a complaint
 
 
 [7]
 Subsection 2 Eleventh (b) of the Railway Labor Act permits a carrier and a union to enter into an agreement for dues checkoffs "Provided, That no such agreement shall be effective with respect to any individual employee until he shall have furnished the employer with a written assignment to the labor organization of such membership dues, ... which shall be revocable in writing after the expiration of one year or upon the termination date of the applicable collective agreement, whichever occurs sooner." 45 U.S.C. § 152 Eleventh (b)
 
 
 [8]
 The Board found that Felter compelled the conclusion that section 23.2 is facially invalid under section 302(c)(4) of the LMRA, 29 U.S.C. § 186(c)(4), and that by maintaining and enforcing the contract, both the Company and PSA committed unfair labor practices. The Company and PSA argue that Felter is inapposite because the wording and legislative histories of subsections 302(c) (4) of the LMRA and 2 Eleventh (b) of the Railway Labor Act are significantly different; the Board and courts have given subsection 302(c)(4) a more liberal reading than subsection 2 Eleventh (b); the requirement of a particular revocation form is only a minor, nonburdensome clerical detail; and the employees, as members of the union which negotiated section 23.2, are barred from challenging its validity. Disposition of these contentions would require us to determine whether a violation of subsection 302(c)(4), perhaps controlled by the Supreme Court's decision in Felter, constitutes an unfair labor practice under section 8 of the NLRA, 29 U.S.C. § 158. See NLRB v. Cameron Iron Works, Inc., 591 F.2d 1, 3 (5th Cir. 1979); In re Salant & Salant, Inc., 88 N.L.R.B. 816, 817-18 (1950). For the reasons stated, however, we need not reach this question
 
 
 [9]
 The Board, in appealing the judgment of the district court, contends that the court lacked jurisdiction because there was neither a case nor controversy before it-PSA and the Company were aligned on the interpretation of section 23.2-and that, alternatively, the district court abused its discretion by not deferring to the Board's primary jurisdiction or by not staying its action pending resolution of the unfair labor practice proceeding. Regardless of the Company's and PSA's positions as to section 23.2 of the contract, the issue of the Company's rights to defense and indemnification under section 23.3 of the collective bargaining agreement presented a live case to the district court. The district court also had jurisdiction under section 301 of the LMRA, 29 U.S.C. § 185, to address any issues of pure contract interpretation. While, with the advantage of hindsight, we may feel that the district court's better course would have been to stay its action, we cannot say that its decision to proceed was an abuse of discretion. Accordingly, the district court judgment is a valid one, except insofar as it conflicts with remedial aspects of the Board's order entered in a proceeding as to which its jurisdiction was exclusive. We need not attempt to delineate the precise jurisdictional line between the two adjudications, it being sufficient simply to confirm by this decision the primacy of the Board's remedial order to the extent any conflict might exist. Specifically not addressed in this opinion, hence neither affirmed nor rejected, is the Board's conclusion that the disputed provision is per se invalid under Felter. That issue we reserve for another day